Roslyn WETHERHORN, Appellant,

v.

ALASKA PSYCHIATRIC INSTITUTE,
Appellee.

No. S–11939.

Supreme Court of Alaska.

April 13, 2007.

James B. Gottstein, Law Project for Psychiatric Rights, Inc., Anchorage, for Appellant.

Laura C. Bottger, Assistant Attorney General, Anchorage, and David W. Márquez, Attorney General, Juneau, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

## OPINION

FABE, Justice.

## I. INTRODUCTION

Roslyn Wetherhorn appeals two superior court orders: one approving her involuntary commitment for thirty days and the other approving the non-consensual administration of psychotropic medication. Wetherhorn challenges the constitutionality of the statute relied on by the court to order her involuntary commitment. She also raises due process and evidentiary challenges to both orders. We conclude that the commitment statute is constitutional if construed to require a level of incapacity so substantial that the respondent cannot survive safely in freedom. But the master's action in granting a petition for the administration of psychotropic medication before a visitor's report had been prepared or provided constitutes plain error. Because we need not determine whether the issues raised by the facts on record, now moot, meet the gravely disabled

standard as construed, and because the other related challenges to the commitment order are either improperly preserved or without merit, we vacate without reversing the order granting the petition for thirty-day commitment.

## II. FACTS AND PROCEEDINGS

On April 4, 2005, Dr. M. Lee of Valley Hospital initiated an application for the examination of Wetherhorn pursuant to AS 47.30.705. Alaska Statute 47.30.705 allows a person to be taken into custody and delivered to the nearest evaluation facility.[1] Dr. Lee's application stated that Wetherhorn was mentally ill and gravely disabled and that considerations of safety did not allow the initiation of involuntary commitment proceedings.

On April 5, 2005, Dr. John McKean filed an ex parte petition for initiation of involuntary commitment pursuant to AS 47.30.710(b). Alaska Statute 47.30.710(b) allows emergency hospitalization if, after examination, a person is found to be mentally ill, causing the person to be gravely disabled or to present a likelihood of serious harm to self or others, and to be in need of treatment.[2] Dr. McKean wrote that Wetherhorn was in a "manic state[,] homeless and non medication compliant × 3 months" in sup-

port of the petition. Superior Court Judge Philip Volland granted the petition the same day.

Also on April 5, 2005, Dr. McKean and Dr. Laurel Silberschmidt filed a petition for thirty-day commitment, averring that Wetherhorn was mentally ill and as a result was both "likely to cause harm to [herself] or others" and "gravely disabled." The supporting facts were stated as "[m]anic state[,] homeless and no insight and non med compliant × 3 months." No prospective witnesses were listed in the space provided. The case was assigned to Superior Court Judge John Suddock and to Probate Master John E. Duggan.

On April 15, 2005, Dr. Jan Kiele filed a petition for the administration of psychotropic medication. Master Duggan issued a notice of hearing and order for appointment of court visitor on the same day, appointing the Office of Public Advocacy (OPA) as court visitor and the Public Defender Agency as counsel for Wetherhorn. This notice also set the hearing on the involuntary medication petition for 1:30 p.m. that same afternoon. As a result, the hearings on both the petition for thirty-day commitment and the petition for the administration of psychotropic medication were held on the same day.

---

1. AS 47.30.705, "Emergency detention for evaluation," provides:

 (a) A peace officer, a psychiatrist or physician who is licensed to practice in this state or employed by the federal government, or a clinical psychologist licensed by the state Board of Psychologist and Psychological Associate Examiners who has probable cause to believe that a person is gravely disabled or is suffering from mental illness and is likely to cause serious harm to self or others of such immediate nature that considerations of safety do not allow initiation of involuntary commitment procedures set out in AS 47.30.700, may cause the person to be taken into custody and delivered to the nearest evaluation facility. A person taken into custody for emergency evaluation may not be placed in a jail or other correctional facility except for protective custody purposes and only while awaiting transportation to a treatment facility. However, emergency protective custody under this section may not include placement of a minor in a jail or secure facility. The peace officer or mental health professional shall complete an application for examination of the person in custody

and be interviewed by a mental health professional at the facility.
 (b) In this section, "minor" means an individual who is under 18 years of age.

2. AS 47.30.710 provides:

 (a) A respondent who is delivered under AS 47.30.700–47.30.705 to an evaluation facility for emergency examination and treatment shall be examined and evaluated as to mental and physical condition by a mental health professional and by a physician within 24 hours after arrival at the facility.
 (b) If the mental health professional who performs the emergency examination has reason to believe that the respondent is (1) mentally ill and that condition causes the respondent to be gravely disabled or to present a likelihood of serious harm to self or others, and (2) is in need of care or treatment, the mental health professional may hospitalize the respondent, or arrange for hospitalization, on an emergency basis. If a judicial order has not been obtained under AS 47.30.700, the mental health professional shall apply for an ex parte order authorizing hospitalization for evaluation.

The combined hearing on April 15, 2005 lasted approximately fifteen minutes. During this hearing, the psychiatrist who testified was not separately sworn or qualified as an expert because his qualifications were carried over from a previous case. There was no oral or written report presented by the court visitor as required under AS 47.30.839(d).[3]

On April 27, 2005, Judge Suddock issued written orders granting both petitions, *nunc pro tunc* to April 15, 2005. This appeal followed.

## III. STANDARD OF REVIEW

 We apply our independent judgment to the interpretation of the Alaska Constitution[4] and statutes,[5] adopting "the rule of law that is most persuasive in light of precedent, reason, and policy."[6] Factual findings in involuntary commitment or medication proceedings are reviewed for clear error, and we reverse only if our review of the record leaves us with a definite and firm conviction that a mistake has been made.[7] The question whether factual findings comport with the requirements of AS 47.30 presents a legal issue, which we review de novo.[8] The superior court's decisions regarding the admissibility of evidence, including expert testimony, are generally reviewed for abuse of discretion.[9] If admissibility of evidence turns on a question of law, we apply our independent judgment.[10]

## IV. DISCUSSION

Wetherhorn challenges both the petition for thirty-day commitment and the petition for the administration of psychotropic medication. Wetherhorn also raises a claim of ineffective assistance of counsel and challenges the qualifications and testimony of the witness in the hearing on both petitions. We first address Wetherhorn's constitutional, procedural, and evidentiary challenges to the petition for thirty-day commitment. We then address Wetherhorn's challenges to the petition for the administration of psychotropic medication. Finally, we address the claims of ineffective assistance of counsel and alleged errors in the admission of witness testimony.

### A. The Petition for Thirty–Day Commitment

#### 1. The constitutionality of AS 47.30.915(7)(B)

 The United States Supreme Court has characterized involuntary commitment for a mental disorder as a "massive curtailment of liberty"[11] that cannot be accom-

---

3. AS 47.30.839, "Court-ordered administration of medication," states in relevant part:
 (d) Upon the filing of a petition under (b) of this section, the court shall direct the office of public advocacy to provide a visitor to assist the court in investigating the issue of whether the patient has the capacity to give or withhold informed consent to the administration of psychotropic medication. The visitor shall gather pertinent information and present it to the court in written or oral form at the hearing. The information must include documentation of the following:
 (1) the patient's responses to a capacity assessment instrument administered at the request of the visitor;
 (2) any expressed wishes of the patient regarding medication, including wishes that may have been expressed in a power of attorney, a living will, an advance health care directive under AS 13.52, or oral statements of the patient, including conversations with relatives and friends that are significant persons in the patient's life as those conversations are remembered by the relatives and friends; oral statements of the patient should be accompanied by a description of the circumstances under which the patient made the statements, when possible.

4. *Grinols v. State*, 74 P.3d 889, 891 (Alaska 2003).

5. *Holderness v. State Farm Fire & Cas. Co.*, 24 P.3d 1235, 1237 (Alaska 2001).

6. *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

7. *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 53 (Alaska 2003).

8. *Id.*

9. *Laidlaw Transit, Inc. v. Crouse ex rel. Crouse*, 53 P.3d 1093, 1097 (Alaska 2002).

10. *Id.*

11. *Humphrey v. Cady*, 405 U.S. 504, 509, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972).

plished without due process of law.[12] Although the State has a legitimate interest in providing care to those who represent a threat to themselves or the community, or who are unable to care for themselves,[13] mental illness alone is insufficient to form a constitutionally adequate basis for involuntary commitment.[14] The Supreme Court has therefore determined that before a person can be involuntarily committed, the court must find in addition to mental illness either: (1) that the person presents a danger to self or others; or (2) that the person is "helpless to avoid the hazards of freedom either through his own efforts or with the aid of willing family members or friends."[15] The precise wording of these two additional requirements is left to the states, "so long as they meet the constitutional minimum."[16]

The two findings required in addition to a finding of mental illness are each aimed at different types of harm. The first finding, of "danger to self or others," is concerned with active forms of harm, where the respondent has demonstrated the affirmative ability or inclination to inflict harm to self or another person.[17] The second finding is concerned with a more passive condition, whereby the respondent is so unable to function that he or she cannot exist safely outside an institutional framework due to an inability to respond to the essential demands of daily life.[18]

Alaska statutes address both types of harm. Alaska Statute 47.30.735(c) permits the court to "commit the respondent to a treatment facility for not more than thirty days if it finds, by clear and convincing evidence, that the respondent is mentally ill and as a result is likely to cause harm to the respondent or others or is gravely disabled." In this case, Wetherhorn was found to be gravely disabled.

Alaska Statute 47.30.915(7) defines "gravely disabled" as follows:

(7) "gravely disabled" means a condition in which a person as a result of mental illness

(A) is in danger of physical harm arising from such complete neglect of basic needs for food, clothing, shelter, or personal safety as to render serious accident, illness, or death highly probable if care by another is not taken; or

(B) will, if not treated, suffer or continue to suffer severe and abnormal mental, emotional, or physical distress, and this distress is associated with significant impairment of judgment, reason, or behavior causing a substantial deterioration of the person's previous ability to function independently[.]

Wetherhorn concedes that subsection A is constitutional, but she challenges subsection B's definition of "gravely disabled" as reflecting a standard insufficient to justify the curtailment of liberty involved in involuntary commitment.

Subsection B was added to AS 47.30.915(7) by the legislature in 1984.[19] The addition was part of a major revision of the civil commitment statutes undertaken "to more adequately protect the legal rights of persons suffering from mental illness."[20] In testimony before the House Health, Education and Social Services Standing Committee discus-

---

12. *Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (citations omitted).

13. *Rust v. State*, 582 P.2d 134, 139 n. 16 (Alaska 1978) ("A person who presents a danger to others is committed under the state's police power. A person who requires care and treatment is committed through exercise of the state's *parens patriae* power. One who poses a danger to himself is committed under a combination of both powers."); *see also Addington*, 441 U.S. at 426, 99 S.Ct. 1804.

14. *O'Connor v. Donaldson*, 422 U.S. 563, 575–76, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975).

15. *Id.* at 575 & n. 9, 95 S.Ct. 2486; *see also Cooper v. Oklahoma*, 517 U.S. 348, 368, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996).

16. *Addington*, 441 U.S. at 431, 99 S.Ct. 1804; *see also Kansas v. Hendricks*, 521 U.S. 346, 359 & 360 n. 3, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997).

17. *In re LaBelle*, 107 Wash.2d 196, 728 P.2d 138, 144 (1986).

18. *Id.*

19. Ch. 142, § 27, SLA 1984.

20. AS 47.30.655.

sion on the revisions, the Director of the Division of Mental Health and Developmental Disabilities of the Department of Health and Social Services explained that the then-current law only allowed Alaska Psychiatric Institute (API) to hold people with violent tendencies and that the addition of the "gravely disabled" language would allow API "to hold people that need to [be held], but haven't shown a violent tendency enough to hold them. There is a very significant number who don't fit into [the] present standard, but can walk out." [21] The expert concluded, "[o]ur hands are tied behind our back, when [a] patient walks out. We only attempt to hold people who are gravely in danger." [22] The committee discussion reveals that the gravely disabled language was added "so that a person can be committed before it's too late." [23] The addition of subsection B was thus intended to broaden the scope of civil commitment standards in order to reach those persons in need of treatment who did not fit within the pre–1984 statutory criteria, which required a showing of violent tendencies before a person could be held involuntarily.[24]

Essentially, then, the dispute between Wetherhorn and API is whether API must wait until the danger caused by a person's mental illness rises to the level indicated by AS 47.30.915(7)(A) before a person may be involuntarily committed. According to Wetherhorn, "only the level of harm described in [AS 47.30.915(7)(A)], i.e., *'serious accident, illness, or death highly probable* if care by another is not taken,' is sufficient to justify the 'massive curtailment of liberty' which is involuntary commitment." API, on the other hand, relies on language in *Addington v. Texas*, which states that a person need only pose *"some* danger" to self or others [25] to argue that the commitment standard has been properly expanded. We disagree with both arguments.

API's citation to *Addington's* use of the phrase "some danger" [26] ignores the United States Supreme Court's repeated admonition that, given the importance of the liberty right involved, a person may not be involuntarily committed if they "are dangerous to no one and can live safely in freedom." [27] This

**21.** *Act Relating to the Treatment of Mentally Ill Persons: Before the Standing and Special Comm. of the M. Health, Educ. & Soc. Servs. Standing 13th Comm.*, Leg.2d Sess. HHES 84/04/24 1342 (Alaska 1984) (statement of Dr. Shapiro, Dir. of Mental Health & Developmental Disabilities, Dep't of Health & Soc. Servs.).

**22.** *Id.*

**23.** *Act Relating to the Treatment of Mentally Ill Persons: Before the Standing and Special Comm. of the M. Health, Educ. & Soc. Servs. Standing 13th Comm.*, Leg.2d Sess. HHES 84/04/24 1730 (Alaska 1984) (statement of Sen. Josephson) (explaining that "[t]he 'gut' of the bill is Pages 18 and 19—'gravely disabled and likely to cause serious harm ...' changed phrasing to include 'mental illness', so that a person can be committed before it's too late (i.e., before they've hurt themselves or someone else)").

**24.** *Act Relating to the Treatment of Mentally Ill Persons: Before the Standing and Special Comm. of the M. Health, Educ. & Soc. Servs. Standing 13th Comm.*, Leg.2d Sess. HHES 84/04/24 1342 (Alaska 1984) (statement of Dr. Shapiro, Dir. of Mental Health & Developmental Disabilities, Dep't of Health & Soc. Servs.). Dr. Shapiro explained that, "[r]ight now ... we're sitting with a law that allows people to walk out the door. We know the person is a time bomb, but if they haven't shown violence in less than [thirty] days, they can [use the courts] to get out."

**25.** *Addington*, 441 U.S. at 426, 99 S.Ct. 1804 (emphasis added).

**26.** *Addington* was concerned with the standard of evidentiary proof required in civil commitment statutes and held that it must be greater than the preponderance of evidence standard but less than the beyond a reasonable doubt standard. 441 U.S. at 431–33, 99 S.Ct. 1804. As *Addington* noted, "[i]ncreasing the burden of proof is one way to impress the factfinder with the importance of the decision and thereby perhaps to reduce the chances that inappropriate commitments will be ordered." *Id.* at 427, 99 S.Ct. 1804.

**27.** *O'Connor*, 422 U.S. at 575, 95 S.Ct. 2486; *see also id.*, 422 U.S. at 574 n. 9, 95 S.Ct. 2486 ("Of course, even if there is no foreseeable risk of self-injury or suicide, a person is literally 'dangerous to himself' if for physical or other reasons he is helpless to avoid the hazards of freedom either through his own efforts or with the aid of willing family members or friends."). In 1996 the Supreme Court noted that "[a]lthough we have not had the opportunity to consider the outer limits of a State's authority to civilly commit an unwilling individual," our decision in [*O'Connor*] makes clear that due process requires at a minimum a showing that the person is mentally ill and either poses a danger to himself or others or is incapable of "surviving safely in freedom."

standard is certainly higher than the requirement that a person merely present "some danger" to herself. API allows that the language of subsection B requires that the respondent must suffer distress that rises to the level of "genuine and serious suffering." Moreover, the plain language of subsection B requires that there be a "significant" impairment causing a "substantial" deterioration.[28] Given that subsection B was added nearly ten years after *O'Connor v. Donaldson*,[29] the plain language of the statute requiring a "substantial deterioration of the person's previous ability to function independently"[30] appears to respond to *O'Connor's* direction that the State "cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom."[31]

We furthermore agree with the Supreme Court of Washington that "[i]t is not enough to show that care and treatment of an individual's mental illness would be preferred or beneficial or even in his best interests."[32] Indeed, AS 47.30.730 does require more than a best interests determination. For example, it requires that the petition for commitment "allege that the evaluation staff has considered but has not found that there are any less restrictive alternatives available"[33] and "allege with respect to a gravely disabled respondent that there is reason to believe that the respondent's mental condition could be improved by the course of treatment sought."[34] As further protection, the statute directs the court to make its findings by "clear and convincing" evidence.[35]

■ We conclude that in order to be constitutional, AS 47.30.915(7)(B) must be construed so that the "distress" that justifies commitment refers to a level of incapacity that prevents the person in question from being able to live safely outside of a controlled environment. This construction of the statute is necessary not only to protect persons against the "massive curtailment of liberty"[36] that involuntary commitment represents, but also to protect against a variety of dangers particular to those subject to civil commitment. For example, there is a danger that the mentally ill may be confined merely because they are "physically unattractive or socially eccentric"[37] or otherwise exhibit "some abnormal behavior which might be perceived by some as symptomatic of a mental or emotional disorder, but which is in fact within a range of conduct that is generally acceptable."[38] A similar concern with the perils of imposing majoritarian values forbids civil commitment to be based on the justification that a person would thereby enjoy a higher standard of living because, as the *O'Connor* Court explained, mental illness, without more, "does not disqualify a person from preferring his home to the comforts of an institution."[39] The level of incapacity represented by AS 47.30.915(7)(B) must be such so as to justify the social stigma that affects the social position and job prospects of persons who have been committed because of mental illness.[40] So construed, AS 47.30.915(7)(B) is constitutional.

Wetherhorn additionally argues that AS 47.30.915(7)(B) is unconstitutional because it does not require that the danger be "immi-

*Cooper*, 517 U.S. at 368, 116 S.Ct. 1373 (citations omitted).

28. AS 47.30.915(7)(B).

29. 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975).

30. AS 47.30.915(7)(B).

31. *O'Connor*, 422 U.S. at 576, 95 S.Ct. 2486.

32. *LaBelle*, 728 P.2d at 146.

33. AS 47.30.730(a)(2).

34. AS 47.30.730(a)(3).

35. AS 47.30.735(c); *see DeNuptiis v. Unocal*, 63 P.3d 272, 278 (Alaska 2003) (acknowledging that the "clear and convincing" standard of proof at minimum is required in civil commitment hearings in Alaska and citing *Addington*, 441 U.S. at 425, 99 S.Ct. 1804).

36. *Humphrey*, 405 U.S. at 509, 92 S.Ct. 1048.

37. *O'Connor*, 422 U.S. at 575, 95 S.Ct. 2486.

38. *Addington*, 441 U.S. at 426–27, 99 S.Ct. 1804.

39. 422 U.S. at 575, 95 S.Ct. 2486.

40. *See, e.g., In re Harris*, 98 Wash.2d 276, 654 P.2d 109, 111 (1982) (citation omitted).

nent." She relies on *Suzuki v. Yuen,* in which a Hawaii civil commitment statute was determined to be unconstitutional because it "failed to specify that the 'danger' to self or others be imminent."[41] But the United States Supreme Court has not made imminence a requirement.[42] We have not yet addressed the question whether the concept of imminence is compatible with the passive nature of harm reflected in the "gravely disabled" definition or whether the "facts and specific behavior of the respondent" required by AS 47.30.730(a)(7) must include recent acts.[43] But we need not address those issues here, because the facts alleged in this case were drawn from the recent past. The petition stated that Wetherhorn had shown a manic state, a lack of insight, and non-compliance with her medication for the past three months. And during the hearing, Dr. Kiele testified that Wetherhorn remained confused and agitated and that her difficulties with insight had not changed since she had been at the hospital. He further noted that she had struck people and therefore presented "a direct risk of harm to others and more of an indirect risk of harm to herself." Because all these examples of specific behavior were drawn from the recent past, they were sufficient to meet the evidentiary standards established by those states that have addressed the question of imminence.[44]

### 2. Procedural due process concerns

■ Having concluded that AS 47.30.915(7)(B) is constitutional if construed to require a level of incapacity so substantial that the respondent is not "capable of surviving safely in freedom,"[45] we now address Wetherhorn's procedural due process challenges to the petition for thirty-day commitment. Involuntary commitment implicates Alaska's constitutional guarantees of individual liberty[46] and privacy[47] and therefore entitles the respondent to due process protections.[48] But in this case, these procedural issues were not raised below and are therefore waived unless they constitute plain error.[49] We will find plain error when there is a "high likelihood that injustice has resulted."[50]

■ Alaska Statute 47.30.730(a)(6) requires a petition for involuntary commitment to "list the prospective witnesses who will testify in support of commitment or involuntary treatment." The petition in this case did not list any witnesses. API concedes that the petition failed to satisfy the statutory requirements. Although Wetherhorn did not object to this error during the hearing, she now argues that the failure to list witnesses amounts to plain error.

But it is unclear what prejudice resulted from the failure to list witnesses in this case. Here, the petition for thirty-day commitment was signed by two API physicians and the only witness testifying before the hearing was another API physician. As API puts it, "[t]hat a psychiatrist from API would testify in support of a petition initiated by API could surprise no one." We therefore conclude that the failure to list witnesses in this case does not constitute plain error.

**41.** 617 F.2d 173, 176 (9th Cir.1980).

**42.** *C.f. In re Harris,* 98 Wash.2d 276, 654 P.2d 109, 112 (1982) (citing *Humphrey,* 405 U.S. at 509, 92 S.Ct. 1048); *In re LaBelle,* 728 P.2d at 144.

**43.** *See, e.g., LaBelle,* 728 P.2d at 146.

**44.** *Id.*

**45.** *O'Connor,* 422 U.S. at 575, 95 S.Ct. 2486.

**46.** *Humphrey,* 405 U.S. at 509, 92 S.Ct. 1048.

**47.** *Myers v. Alaska Psychiatric Inst.,* 138 P.3d 238, 246 (Alaska 2006) ("[W]e ... similarly hold that Alaska's statutory provisions permitting non-consensual treatment with psychotropic medications implicate fundamental liberty and privacy interests.").

**48.** *Foucha v. Louisiana,* 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action. It is clear that commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.") (citations and internal quotation omitted).

**49.** *Martinez v. Cape Fox Corp.,* 113 P.3d 1226, 1229 (Alaska 2005).

**50.** *Id.*

Wetherhorn also claims that the requirements of AS 47.30.730(a)(7) were not fulfilled. Alaska Statute 47.30.730(a)(7) requires a petition for thirty-day commitment to list the facts and specific behavior that support the petition for involuntary commitment. The commitment petition in this case states: "Manic state[,] homeless and no insight and non med compliant × 3 months." Wetherhorn argues both that this statement was inadequate to support the petition and that it constituted a due process violation because the sentence did not afford her meaningful notice or a meaningful opportunity to respond. Again, because Wetherhorn did not raise this objection below, we review her complaints under the plain error standard.

■ In her challenge to the sufficiency of the language on the petition, Wetherhorn argues that the list of facts and specific behaviors on the petition must: "(1) be sufficient, without supplementation, to entitle the petitioner to the granting of the petition as a matter of law, and (2) to at least summarize all of the evidence the state intends to put on in its case in chief." But Wetherhorn's proposed requirements go far beyond what Alaska statutes require. Alaska Statute 47.30.730(a)(7) merely requires that the petition allege "facts and specific behavior" supporting the conclusion that the respondent meets the standards for commitment and does not articulate the standard by which the sufficiency of the facts and behavior listed is to be judged. And because whether a person is actually committed depends on the hearing, not on the petition standing alone,[51] there is no reason to require that the petition summarize all the evidence or be sufficient in itself to entitle the petitioner to a grant of the petition as a matter of law.

■■ Wetherhorn's second argument is that the factual allegations listed on the petition were insufficient to afford notice as required by due process. As a general principle, due process "requires that the notice of a hearing must be appropriate to the occasion and reasonably calculated to inform the person to whom it is directed of the nature of the proceedings."[52] Due process also requires that a respondent be notified in such a manner that respondent has a reasonable opportunity to prepare.[53] Here, the petition and notice of hearing were reasonably calculated to inform Wetherhorn of the nature and purpose of the commitment hearing. The petition listed the "facts and specific behavior" to be raised at the hearing: Wetherhorn's (1) current manic state; (2) state of homelessness; (3) lack of insight; and (4) failure to take her prescribed medication for the last three months. We conclude that no prejudice resulted because this information was sufficient to inform Wetherhorn of the purpose of the hearing, the statutory scheme and evidentiary standard to be applied, and the kind of facts to be adduced at the hearing. It was sufficiently detailed to allow her to prepare for the hearing.

### 3. Evidentiary challenges to the petition for thirty-day commitment

[15, 16] Finally, Wetherhorn contends that the evidence presented at the hearing was insufficient to establish that she met the standards for commitment under the clear and convincing standard required by AS 47.30.735(c). But the thirty-day period for which Wetherhorn was committed has long since passed, and the question is thus moot. "A claim is moot if it is no longer a present, live controversy, and the party bringing the action would not be entitled to relief, even if it prevails."[54] We will, however, consider a question otherwise moot if it falls within the public interest exception to the mootness doctrine. The three factors in determining whether the public interest exception applies are: "(1) whether the disputed issues are

---

**51.** AS 47.30.735(c).

**52.** *Huntley v. N.Carolina State Bd. of Ed.*, 493 F.2d 1016, 1019 (4th Cir.1974) (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950)).

**53.** *French v. Blackburn*, 428 F.Supp. 1351, 1357 (M.D.N.C.1977), *aff'd*, 443 U.S. 901, 99 S.Ct.

3091, 61 L.Ed.2d 869 (1979); *see also In re Richard E.*, 12 A.D.3d 1019, 785 N.Y.S.2d 580 (N.Y.App.Div.2004).

**54.** *Fairbanks Fire Fighters Ass'n, Local 1324 v. City of Fairbanks*, 48 P.3d 1165, 1167 (Alaska 2002).

capable of repetition, (2) whether the mootness doctrine, if applied, may cause review of the issues to be repeatedly circumvented, and (3) whether the issues presented are so important to the public interest as to justify overriding the mootness doctrine." [55]

■ In this case, Wetherhorn was committed based on a specific set of facts that amounted to a finding that she was gravely disabled. For example, her beliefs that the owner of the local grocery store was going to transport her to the Pope's funeral and that she had bought a church indicated that she lacked insight. She was diagnosed with bipolar disorder, the most recent episode of which was manic. She had also struck people at the hospital and was alternately confused and agitated and had trouble sleeping. At her hearing, Wetherhorn told the master that she wanted to stay at the hospital "until I get well, until I'm stabler than I am now." These facts are all specific to Wetherhorn's condition immediately before and at the time of her hearing. If it were to become necessary to seek Wetherhorn's commitment again, the hearing would be based on a different set of facts specific to different circumstances. It is unclear how two different hearings based on different facts and circumstances could be compared, and thus the factual questions are not capable of repetition. Because the issue here is not capable of repetition, the public interest exception to the mootness doctrine does not apply, and we refrain from considering this issue.

## B. The Petition for Administration of Psychotropic Medication

Wetherhorn raises two challenges specific to the petition for the administration of psychotropic medication. Both of these challenges are affected by our decision in *Myers v. Alaska Psychiatric Institute*,[56] which had not yet been decided at the time of Wetherhorn's hearing.

### 1. The failure to submit a visitor's report

■ Alaska Statute 47.30.839(d) provides that when a petition for the involuntary administration of medication is filed, the court must direct OPA "to provide a visitor to assist the court in investigating the issue of whether the patient has the capacity to give or withhold informed consent to the administration of psychotropic medication." Here, the superior court appointed OPA, as required, but no visitor's report was presented during the hearing and there was no reason given for the failure to present it. API concedes that an "obvious mistake was made with regard to the statutorily-required court visitor report" and agrees that the requirement of a visitor's report is mandatory. API nevertheless attempts to explain that the lack of a visitor's report was an "inevitable and regrettable consequence of the timing of events," because in Wetherhorn's case the hearing was held on the same day that the petition was filed and OPA was appointed as visitor. API insists that "[t]his schedule permitted no time for the court visitor to fulfill its statutory obligation."

But this was a petition for the involuntary administration of psychotropic medication in a non-emergency situation. Unlike involuntary commitment petitions,[57] there is no statutory requirement that a hearing be held on a petition for the involuntary administration of psychotropic drugs within seventy-two hours of a respondent's initial detention. The expedited process required for involuntary commitment proceedings is aimed at mitigating the infringement of the respondent's liberty rights that begins the moment the respondent is detained involuntarily. In contrast, so long as no drugs have been administered, the rights to liberty and privacy implicated by the right to refuse psychotropic medications[58] remain intact. Therefore, in the absence of an emergency, there is no reason why the statutory protections should be neglected in the interests of speed. As API itself concedes, a hearing on a medi-

55. *Akpik v. State, Office of Mgmt. & Budget,* 115 P.3d 532, 536 (Alaska 2005) (citation omitted).

56. 138 P.3d at 238.

57. AS 47.30.725(b).

58. *Myers,* 138 P.3d at 246.

cation petition should be continued rather than proceed without a visitor's report.

Furthermore, the court visitor's report is no mere technical requirement. As we explained in *Myers,* psychotropic medications are "highly intrusive" medications [59] and have been equated with the "intrusiveness of electroconvulsive therapy and psychosurgery." [60] Alaska requires a two-step process before psychotropic drugs may be administered involuntarily in a non-crisis situation: the State must first petition for the respondent's commitment to a treatment facility,[61] and then petition the court to approve the medication it proposes to administer.[62] The second step requires that the State prove by clear and convincing evidence that: (1) the committed patient is currently unable to give or withhold informed consent; [63] and (2) the patient never previously made a statement while competent that reliably expressed a desire to refuse future treatment with psychotropic medication.[64] In order that the court may make an informed decision concerning these two issues, the court visitor is appointed "to assist the court in investigating the issue of whether the patient has the capacity to give or withhold informed consent" by evaluating "the patient's responses to a capacity assessment instrument administered at the request of the visitor" [65] and to document "any expressed wishes of the patient regarding medication, including wishes that may have been expressed in a power of attorney, a living will, an advance health care directive . . ., or oral statements of the patient." [66] The visitor's report is therefore essential to the court's mandatory duty to determine whether the patient is presently competent to provide informed consent [67] or, if the patient is determined not to be presently competent, to decide whether the patient was competent to provide informed consent at the time of previously expressed wishes to refuse psychotropic medication.[68] The prejudice to the respondent whose case is decided without the visitor's report is clear. Because the visitor's report is an essential component of the statutory scheme, the failure to prepare and present the report before the hearing in Wetherhorn's case is an instance of plain error.

2. **Evidentiary challenges to the petition for the involuntary administration of psychotropic medication**

■ Wetherhorn additionally argues that the evidence presented with regard to the petition for the involuntary administration of psychotropic medication was insufficient to meet the clear and convincing standard. As an initial matter, the issue is again moot with regard to Wetherhorn because the facts given in support of the need for medication are specific to a certain time and place as was the case of the petition for thirty-day commitment. Nevertheless, in light of our decision in *Myers,* the court must in non-emergency cases make specific findings: (1) that the respondent is incapable of giving or withholding informed consent and has not made a previous statement while competent expressing a choice; (2) that the proposed treatment is in the respondent's best interest; and (3) that no less intrusive alternative is available.[69]

59. *Id.* at 242, 138 P.3d 238.

60. *Id.*

61. AS 47.30.700–.815.

62. AS 47.30.836(3); AS 47.30.839.

63. AS 47.30.836(3); AS 47.30.839(g).

64. AS 47.30.839(d)(2); AS 47.30.839(g).

65. AS 47.30.839(d)(1).

66. AS 47.30.839(d)(2).

67. AS 47.30.839(f) provides:

If the court determines that the patient is competent to provide informed consent, the court shall order the facility to honor the patient's decision about the use of psychotropic medication.

68. AS 47.30.839(g) provides in relevant part:

If the court determines that the patient is not competent to provide informed consent and, by clear and convincing evidence, was not competent to provide informed consent at the time of previously expressed wishes documented under (d)(2) of this section, the court shall approve the facility's proposed use of psychotropic medication.

69. 138 P.3d at 254.

## C. Remaining Procedural Challenges

The master addressed the petition for thirty-day commitment and the petition for the administration of psychotropic medication in the same hearing. We now turn to Wetherhorn's challenges to the procedures followed in that hearing.

### 1. Failure to swear in and qualify the witness as an expert

■ Dr. Jan Kiele was the sole witness to testify at the hearing on the two petitions. At the beginning of the hearing, Master Duggan stated that "Dr. Kiele has previously been sworn, so just a reminder that he is still under oath. And also, he's been qualified as an expert in the field of psychiatry." Although Wetherhorn did not object to this method of reminding Dr. Kiele that he remained under oath at the hearing, Wetherhorn now argues that the failure to require Dr. Kiele to give an oath before each case and to qualify him as an expert in her particular case constituted plain error.

Alaska Evidence Rule 603 requires every witness to declare that he or she will testify truthfully. The intent of the rule is expressed in its requirement that a witness be sworn in a manner "calculated to awaken the witness' conscience and impress the witness' mind with the duty to [testify truthfully]." [70] This purpose was satisfied by the master's reminder to Dr. Kiele that he had been previously sworn and remained under oath. Furthermore, Wetherhorn makes no argument or showing that injustice resulted from the failure to swear in Dr. Kiele. Because the intent of the rule was satisfied and because no injustice was shown to have resulted, we conclude that the failure to swear in Dr. Kiele in this case does not constitute plain error.

■ Alaska Evidence Rule 702(a) requires that a witness be qualified as an expert before proceeding to provide expert opinion testimony. [71] Wetherhorn argues that the failure to qualify Dr. Kiele during her hearing constitutes error because no rec-

ord was produced from which the trial or appellate courts could determine that his qualifications were proper. But Wetherhorn does not argue that a psychiatrist working for API would not be qualified as an expert in psychiatry or that a psychiatrist already qualified as an expert in another case would fail to be similarly qualified in her case. Dr. Kiele also made no attempt to hide his limited knowledge · of Wetherhorn's case. Because it is unclear what injustice resulted from the failure to qualify the API psychiatrist, we conclude that it did not constitute plain error.

### 2. Ineffective assistance of counsel

■ Wetherhorn additionally contends that she was deprived of her right to counsel during the hearing because her counsel failed to deploy a number of strategies that may have changed the outcome of the hearing. She raises this claim for the first time on appeal. The right to counsel provided for in AS 47.30.725(d) necessarily includes both the right to effective counsel and the right to challenge court orders based on a claim of ineffective assistance of counsel. But because such a claim cannot be effectively reviewed for the first time on appeal, we decline to address the merits of the claim in this case.

■ Alaska Statute 47.30.725(d) provides: "[t]he respondent has the right to be represented by an attorney, to present evidence, and to cross-examine witnesses who testify against the respondent at the hearing." Alaska Statute 47.30.700(a) provides that an attorney shall be appointed for the respondent within forty-eight hours of the initial investigation. Because, as we have already noted, a respondent's fundamental rights to liberty and to privacy are infringed upon by involuntary commitment and involuntary administration of psychotropic medication . proceedings, the right to counsel in civil proceedings is guaranteed by the due process clause of the Alaska Constitution. [72]

---

**70.** Alaska R. Evid. 603.

**71.** *See L.C.H. v. T.S.,* 28 P.3d 915, 923 (Alaska 2001).

**72.** Alaska Const. art. I, § 7; *V.F. v. State,* 666 P.2d 42, 45 & n. 2 (Alaska 1983) (holding that the due process clause of the Alaska Constitution

As we noted in *V.F. v. State*, "whenever the right to counsel is constitutionally guaranteed in a particular proceeding, the effective assistance of counsel is also constitutionally required." [73] And the right to challenge a court order based on a claim of ineffective assistance of counsel derives necessarily from the right to the effective assistance of counsel.

But as has been previously discussed in the criminal context, it is difficult for an appellate court to review a claim of ineffective assistance of counsel unless a record has been developed that includes findings of facts and conclusions of law regarding the claim.[74] Therefore, in *Barry v. State*, the court of appeals "require[d] that the question of ineffective assistance of counsel be argued first to the trial judge either in a motion for a new trial or an application for post-conviction relief." [75] In this case, we cannot review a claim for ineffective assistance of counsel without an explanation in the record for counsel's actions; otherwise we become engaged "in the perilous process of second-guessing." [76] Because in this case no record has been developed, we do not review the issues. We therefore require respondents to establish a record concerning counsel's challenged acts or omissions by applying to the trial court to seek a new commitment and medication hearing by a motion for relief under Alaska Civil Rule 60(b) or by a Civil Rule 86 habeas corpus petition.[77]

## V. CONCLUSION

We conclude that the definition of "gravely disabled" in AS 47.30.915(7)(B) is constitutional if construed to require a level of incapacity so substantial that the respondent is incapable of surviving safely in freedom. We also conclude that the failure to provide a

visitor's report during the hearing on a petition for the administration of psychotropic medication as required by AS 47.30.839(d) is an instance of plain error. Because we need not determine whether the issues raised by the facts on record, now moot, meet the gravely disabled standard of AS 47.30.915(7)(B) as construed, and because we conclude that Wetherhorn's other challenges to the petition for thirty-day commitment and to the conduct of counsel and the swearing in and qualification of the witness are without merit, we VACATE the superior court's order granting that petition without need for remand.

---

guarantees the right to effective counsel in proceedings for the termination of parental rights).

**73.** 666 P.2d at 45 (citations omitted).

**74.** *See, e.g., Barry v. State*, 675 P.2d 1292, 1295 (Alaska App.1984).

**75.** *Id.*

**76.** *Id.* (citation and quotation omitted).

**77.** Wetherhorn additionally argues for a standard of review to be applied to the acts or omissions of counsel in civil cases that differs from that used in the criminal context. *See Risher v. State*, 523 P.2d 421, 424–25 (Alaska 1974). Wetherhorn also argues for the establishment of five requirements that must be met before counsel may be deemed competent in a civil commitment case. Because we have determined that her claim for ineffective assistance of counsel cannot be reviewed directly on appeal, we do not reach these issues.