NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Necessity for the Hospitalization of | ) ) ) | Supreme Court No. S-18433 |
| RYAN T. | ) ) | Superior Court No. 1JU-22-00123 PR |
| | ) ) ) | MEMORANDUM OPINION AND JUDGMENT[*] |
| | ) ) | No. 2023 – April 17, 2024 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Juneau, Marianna C. Carpeneti, Judge.

Appearances: Kelly R. Taylor, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Ryan T. Noah I. Star, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for State of Alaska.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

## I.   INTRODUCTION

A man with a long history of suffering from schizophrenia and extensive delusions voluntarily sought treatment at a hospital. When he attempted to leave against medical advice, hospital staff sought an involuntary commitment order. After a hearing, the court found that the man was mentally ill and, as a result, gravely disabled. The

---

[*]     Entered under Alaska Appellate Rule 214.

man appeals the determination that he was gravely disabled. Seeing no error, we affirm the commitment order.

## II.   FACTS AND PROCEEDINGS

### A.   Facts

Ryan T. is a 37-year-old man from Angoon.[1]  For at least 10 years Ryan has been diagnosed with schizophrenia and has exhibited symptoms that include "developed delusions" about his body and threats to his life.  Ryan has also been diagnosed with a thought disorder that results in rambling and incomprehensible speech.

Prior to his most recent hospital admission, Ryan had been hospitalized four times at Bartlett Regional Hospital (Bartlett) in Juneau and at least two times at Alaska Psychiatric Institute (API).  His prior admissions to Bartlett occurred circa 2017-2018.  At some point after those admissions Ryan lived unhoused in Anchorage.

During February and March 2022 Ryan was admitted nine times to an Anchorage emergency room for various physical and mental complaints.  Then in April he had an additional four visits over a 10-day period.  At least some of these hospital visits were related to his delusions about being poisoned or about his nose being broken. During his last visit he "appeared to be decompensating pretty significantly" and the hospital arranged for him to return to Angoon to be near family.  Within one day of his arrival in Angoon, Ryan left for Juneau, and upon arrival in Juneau, checked himself into Bartlett on a voluntary basis.

About one week later, Ryan attempted to leave Bartlett against medical advice.  While attempting to leave, he became agitated and threatened to punch his doctor in the face.  Ultimately Ryan was prevented from leaving the hospital, and his doctor filed a petition for an order authorizing hospitalization for evaluation and a notice

---

[1]     We use a pseudonym to protect Ryan's privacy.

of emergency detention.[2]  The court authorized the detention and evaluation the same day.  Shortly thereafter Ryan's doctor filed a petition for a 30-day commitment.[3]

### B.    Proceedings

#### 1.    The commitment hearing

The court held a 30-day commitment hearing on May 5, two days after the petition was filed.[4]  The only people to testify at the hearing were Dr. Helen Short, Ryan's doctor at Bartlett, and Ryan.

Dr. Short first testified about Ryan's mental illness and resulting symptoms.  She testified that he has a longstanding diagnosis of schizophrenia, a thought disorder, and "developed delusions."  These delusions include the belief that people are putting feces, urine, or poison in his nose or ears, that the left side of his face is caved in, that he has a wire "from the back of his tooth to the back of his head causing his head to shrink," that his medication causes his symptoms, and that his mother and various others are trying to kill or poison him.  Dr. Short also testified that Ryan's thought disorder manifested as incomprehensible speech, rambling, "word salad," and

---

[2]    AS 47.30.700(a) (outlining process for petitioning superior court for order authorizing hospitalization of individual for full evaluation to determine if civil commitment criteria are met); AS 47.30.705(a) (providing that "mental health professional" may cause individual "to be taken into custody" pending evaluation where there is "probable cause to believe that a person is gravely disabled or is suffering from mental illness and is likely to cause serious harm to self or others of such immediate nature that considerations of safety do not allow initiation of involuntary commitment procedures set out in AS 47.30.700").

[3]    AS 47.30.715 (outlining process evaluation facility must take after receiving order for evaluation and requiring court to set 30-day commitment hearing within 72 hours after individual's arrival at facility); AS 47.30.730 (outlining process and requirements for petition for commitment to treatment facility).

[4]    AS 47.30.735 (outlining procedures and requirements for 30-day commitment hearing).

the inability to have "any kind of conversation" with other people. She remarked that Ryan had not "been rational up until the last day or so" before the hearing.

Ryan's testimony confirmed many of Dr. Short's observations. Ryan asserted that he wanted to leave Bartlett because he did not "like the head shrinkage," because the medication was disabling him, and because he needed to work. He also discussed his belief that people were cutting the back of his jaw, attacking his nose, and putting "stuff" in his nose; that his mother was trying to kill him; that he had been attacked in various hotels in Anchorage; that people had "dropped, like, blood . . . straight through the back of [his] ear and it went down into [his] stomach;" and that his mother kept him from eating. The court's later order characterized Ryan's testimony as "totally delusional."

Regarding grave disability, Dr. Short testified that Ryan could not live outside of a controlled environment in his current state. She observed that he had nowhere to go or stay, had no money, had been argumentative and irrational, and would get into fights. Moreover, attempts at discharge planning with Ryan were difficult because he was "resistant" and believed that the hospital could provide services that it could not, such as putting him in "emergency housing," "get[ting] him a $400 trailer," or finding him a roommate.

Dr. Short confirmed that her concern for Ryan was not just homelessness but that Ryan would be unable to take care of himself if released from Bartlett. She explained that Ryan had long cycled through a pattern of taking medication in the hospital, getting a little better, then leaving and stopping the medication, and deteriorating. She testified that Ryan's long history of cyclical deteriorations had caused him "great distress" in the recent past, leading him to seek out emergency treatment at least 13 times between February and May of 2022. In addition, during his stay at Bartlett, Ryan "complain[ed] bitterly about his nose and holes in his nose," but would not let anyone examine it. He had also exhibited a high pulse, palpitations, and

an abnormal heart rhythm, possibly associated with the emotional and physical stress caused by his delusions and paranoia.

Dr. Short further testified about Ryan's frequent refusal to eat. In particular Ryan had stopped eating during a previous stay at API because he believed that people were "putting things in his food." Dr. Short described Ryan's condition on his most recent admission as "disheveled" and not having eaten recently. Ryan testified that if he were released, he had access to food and would eat, but he also stated that he had food stamps and that food stamps "turn the food in the store bad."[5] He further disclosed that at some previous point he "was unable to eat for like 31 days" and that he did not want to return to Angoon because "they do keep me from eating."[6]

During Ryan's stay at Bartlett he had been accepting oral medication and had "gotten better over the last few days." This included being "less delusional," and much more willing to go back to Angoon or to talk about other discharge options. Nevertheless Dr. Short did not believe there was a less restrictive alternative for Ryan's treatment because medication was the only treatment option for the time being and Ryan would not continue taking his medication outside the hospital.

### 2. The superior court's findings

At the end of the hearing the superior court attempted to make oral findings, but Ryan became agitated and would not stop interrupting. The court thus issued its findings in writing.[7] Related to grave disability, the court found that Ryan's

---

[5] Other testimony indicated that Ryan receives some state or federal benefits and that his mother is his payee.

[6] Ryan's testimony is unclear on who "they" are, but at the time his testimony was primarily referencing his mother.

[7] The court stated at the hearing that it was finding by clear and convincing evidence that Ryan was mentally ill. But then Ryan interrupted and would not stop talking, so the court later stated that it would not "put findings on the record" and would "issue a written order." The State indicated that it would rely on the written order.

delusions about people putting things in his nose and ears caused him "serious emotional distress," as well as physical distress. The court observed that Ryan's delusions caused him to go without eating for periods of time and that he had not been eating for some time prior to his recent admission to Bartlett. The court also found that Ryan's distress was "associated with a significant impairment of judgment, causing a substantial deterioration of his ability to function independently," and that Ryan's "delusion that his medications cause him harm in particular makes it hard for him to function until he has become stabilized." Finally, the court observed that Ryan's presentation at the hearing confirmed Dr. Short's testimony about the nature and severity of his symptoms. The court concluded that Ryan was mentally ill and that he was gravely disabled under both AS 47.30.915(9)(A) and (B),[8] and it committed Ryan for up to 30 days.

Ryan now appeals the superior court's commitment order.

## III. STANDARD OF REVIEW

"Factual findings in involuntary commitment proceedings are reviewed for clear error, and we overturn these findings only where a review of the record leaves us 'with a definite and firm conviction that a mistake has been made.' "[9] "Whether factual findings comport with the requirements of AS 47.30 presents a legal issue, which we review de novo."[10]

---

[8] *See* former AS 47.30.915(9)(A)-(B) (2021) (defining "gravely disabled"). Since Ryan's hearing the subsection (B) definition of "gravely disabled" has been amended and both definitions have been recodified. *See* Ch. 41, § 29, SLA 2022 (codified as amended at AS 47.30.915(11)).

[9] *In re Hospitalization of Stephen O.*, 314 P.3d 1185, 1191 (Alaska 2013) (quoting *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 375 (Alaska 2007)).

[10] *Id.* (citing *Wetherhorn*, 156 P.3d at 375).

## IV. DISCUSSION

In order to involuntarily commit an individual a court must find, "by clear and convincing evidence, that the [person] is mentally ill and as a result is likely to cause harm to [himself] or others or is gravely disabled."[11] At the time of Ryan's 30-day commitment hearing, gravely disabled was defined as "a condition in which a person as a result of mental illness,"[12]

> (A) is in danger of physical harm arising from such complete neglect of basic needs for food, clothing, shelter, or personal safety as to render serious accident, illness, or death highly probable if care by another is not taken; or
> (B) will, if not treated, suffer or continue to suffer severe and abnormal mental, emotional, or physical distress, and this distress is associated with significant impairment of judgment, reason, or behavior causing a substantial deterioration of the person's previous ability to function independently.[13]

We have previously held that in order for subsection (B)'s definition of gravely disabled to be applied constitutionally, the "deterioration" of the person's ability to function must reach "a level of incapacity that prevents the person in question from being able to live safely outside of a controlled environment."[14] We have cautioned that "[i]t is not

---

[11]     AS 47.30.735(c).

[12]     Former AS 47.30.915(9) (2021).

[13]     *Id.*

[14]     *Wetherhorn*, 156 P.3d at 378, *overruled on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918 (Alaska 2019). The legislature amended former AS 47.30.915(9)(B) in 2022 to define gravely disabled as "a condition in which a person as a result of mental illness . . . is so incapacitated that the person is incapable of surviving safely in freedom." Ch. 41, § 29, SLA 2022 (codified as amended at AS 47.30.915(11)(B)). This amendment essentially enshrined the *Wetherhorn* holding in statute. *See Wetherhorn*, 156 P.3d at 373 (stating that commitment statute is constitutional "if construed to require a level of incapacity so substantial that the respondent cannot survive safely in freedom").

enough to show that care and treatment of an individual's mental illness would be preferred or beneficial or even in [that person's] best interests."[15] Mental illness itself, a lack of shelter alone, or socially eccentric behavior are not sufficient to find a person gravely disabled.[16] Instead, the person must be unable to "survive safely in freedom."[17]

Ryan argues that the court's findings in his case are insufficient to meet the required standard. Ryan points out that the court's written findings closely track the statutory text of former AS 47.30.915(9)(B), and he argues that those findings do not address the additional requirement under *Wetherhorn* that a person be so incapacitated as a result of mental illness that the person cannot survive safely in freedom. And Ryan contends that the court's findings were insufficient to establish that he was gravely disabled under any definition. While we agree with Ryan that the superior court's findings appear to have been directed toward the former subsection (9)(B) definition of "gravely disabled," we disagree with Ryan's argument that the court's findings were insufficient under the circumstances.

In *In re Hospitalization of Naomi B.* we affirmed a superior court's finding of grave disability under former AS 47.30.915(9)(B) where the respondent's delusions, lack of housing, total inability to obtain housing, inability to communicate her needs to others, and questionable ability to "eat and shower regularly" without help evidenced a significant deterioration in her condition and ability to care for herself.[18] Relevant to the superior court's determination was the respondent's history of refusing medication and then decompensating, and the great likelihood that this cycle would repeat if the

---

**15**     *In re Naomi B.*, 435 P.3d at 932 (alterations in original) (quoting *Wetherhorn*, 156 P.3d at 378).

**16**     *See Wetherhorn*, 156 P.3d at 378.

**17**     *Id.* at 373.

**18**     *In re Naomi B.*, 435 P.3d at 932.

respondent were released from the hospital.[19]  Further, the superior court in that case heard uncontroverted expert witness testimony that the individual could not survive outside of a controlled environment.[20]  Ryan's case is similar.

While it is true that the court's findings closely track former subsection (B) of the statutory definition of "gravely disabled"[21] and do not explicitly state the additional *Wetherhorn* requirement[22] — that the respondent be incapable of surviving outside a controlled environment[23] — the court's detailed written findings, which are supported in the record, coupled with the uncontroverted expert witness testimony that Ryan was unable to survive outside of the controlled hospital environment, convince us that the court did not err in concluding that Ryan was gravely disabled.

The superior court's written order details Ryan's severe and persistent delusions and paranoia and describes how those symptoms impact his life.  Included in the court's findings are that Ryan's delusions cause him serious distress, leading him to

---

[19]     *Id.* at 932, 936.

[20]     *See id.* at 932.

[21]     The court's order discusses Ryan's distress, and states that "[t]his distress is associated with a significant impairment of judgment, causing a substantial deterioration of his ability to function independently."  This language closely parallels former AS 47.30.915(9)(B) (2021).

[22]     Although the superior court's findings individual to Ryan's case do not specifically state that he is unable to survive outside a controlled environment, we note that the form portion of the order itself does recognize the *Wetherhorn* requirement in defining grave disability.  Under the space provided for the court's individual findings, the form portion of the order outlines the two-part statutory definition of grave disability and then provides: "Note: In *Wetherhorn v. Alaska Psychiatric Institute*, 156 P.3d 371 (Alaska 2007), the Alaska Supreme Court 'concluded that AS 47.30.915(9)(B) is constitutional if construed to require a level of incapacity so substantial that the respondent is not capable of surviving safely in freedom.' "  We do not assume that the form's definition of grave disability constitutes a finding of the court, but we observe that the face of the order acknowledges the *Wetherhorn* requirement.

[23]     *Wetherhorn*, 156 P.3d at 378.

believe and experience that others are poisoning him and putting things in his ears and nose, and often keeping him from eating. The superior court also found that Ryan's distress due to his symptoms had resulted in multiple recent emergency room admissions and, importantly, caused Ryan to think that his medication would harm him. The court also noted that on the day of the hearing, despite testimony that he had improved, Ryan appeared "totally delusional." The court further found that it was "hard for [Ryan] to function until he has become stabilized." These written findings are supported in the record and indicate a level of deterioration consistent with Ryan being unable to safely survive in freedom.

Moreover, the record includes testimony that Ryan had nowhere to go in Juneau and no money, was unlikely to be able to access shelter, and would immediately stop taking medication and quickly decompensate after release. And the record indicates that when Ryan decompensates, he is unable to communicate with or understand others. Finally Dr. Short provided uncontroverted expert testimony that Ryan could not live safely outside of a controlled environment, supporting the court's ultimate decision that clear and convincing evidence demonstrated Ryan was gravely disabled under former AS 47.30.915(9)(B).[24]

## V.    CONCLUSION

We AFFIRM the court's determination that Ryan was gravely disabled, as well as its resulting commitment order.

---

[24]    The State also argues that the court did not err because Ryan was gravely disabled under former AS 47.30.915(9)(A) (2021) and that he was also likely to cause harm to others. Because we affirm the court's commitment order under former AS 47.30.915(9)(B) (2021), we need not address these alternate arguments. *See In re Hospitalization of Sergio F.*, 529 P.3d 74, 78 (Alaska 2023) (addressing only one argument because it was dispositive); *E.P. v. Alaska Psychiatric Inst.*, 205 P.3d 1101, 1111 (Alaska 2009) (affirming on grounds that person was likely to harm himself, and not addressing whether person was likely to harm others).