NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Necessity for the Hospitalization of | ) ) ) | Supreme Court No. S-16535 |
| RANDY N. | ) ) ) ) ) ) ) ) ) | Superior Court No. 3AN-16-02486 PR <br><br> MEMORANDUM OPINION AND JUDGMENT* <br><br> No. 1717 – April 3, 2019 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Catherine M. Easter, Judge.

Appearances: Emily L. Jura, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant. Shelley J. White, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

## I.   INTRODUCTION

After an involuntary commitment hearing, the superior court standing master relied in part on a court-ordered screening investigation report that had not been admitted into evidence for his finding that the respondent was gravely disabled; the superior court signed the proposed commitment order the day after it was issued by the master. The respondent appeals, arguing that the court erred by relying on facts not in

---

\*      Entered under Alaska Appellate Rule 214.

evidence and that there was insufficient evidence of grave disability. But the master was entitled to rely on expert witness testimony to support his decision. Prior to testifying, the expert reviewed the screening investigation report and interviewed the family. The expert testified without any objection to matters in the report. The expert was able to cite to the report to explain her professional opinion that the respondent was gravely disabled, and it was not error for the master to rely on her testimony as supported by the report. Conducting a de novo review, we determine that there was clear and convincing evidence of grave disability. We affirm the superior court's decision granting the 30-day commitment order.

## II. FACTS AND PROCEEDINGS

### A. Petition For Order Authorizing Hospitalization For Evaluation

Randy N.[1] was involuntarily committed and involuntarily medicated in October 2016, after his wife petitioned for an order authorizing his hospitalization for an evaluation for mental illness. A superior court master ordered a screening investigation by a mental health professional who conducted telephonic interviews with Randy's wife and his 13-year-old daughter. Because the wife and daughter alleged Randy "ha[d] been extremely aggressive" and there was "concern[] that he could become violent towards his family or others should he learn that his family [was] seeking hospitalization for him," the screener deemed it unsafe to contact and interview him. Based on the interviews, she reported that Randy "appear[ed] to meet criteria for part B of grave disability" because of "severe and abnormal mental and emotional distress . . . associated with significant impairment of his judgment, reason, and behavior" that was "causing a

---

[1]     A pseudonym has been used to protect the appellant's privacy.

substantial deterioration of his previous ability to function independently."[2] She recommended that he "be evaluated and treated in a secure setting." The master determined that there was probable cause to believe Randy was mentally ill[3] and gravely disabled[4] and ordered that Randy be hospitalized at Alaska Psychiatric Institute (API) for up to 72 hours for an evaluation of his mental and physical condition.

## B.    Petition For 30-Day Commitment

API subsequently petitioned for a 30-day commitment, alleging that Randy was "gravely disabled and there [was] reason to believe that [his] mental condition could be improved by the course of treatment sought." API also petitioned for court approval of administration of psychotropic medication. A hearing was held before a master, and two witnesses testified: Cynthia Montgomery, an advanced nurse practitioner at API with a Ph.D. in psychology who was qualified as an expert in psychiatric medicine, testified on behalf of API; and Randy testified on his own behalf.

---

[2]    *See* AS 47.30.915(9)(B) (defining "gravely disabled" as "a condition in which a person as a result of mental illness . . . will, if not treated, suffer or continue to suffer severe and abnormal mental, emotional, or physical distress, and this distress is associated with significant impairment of judgment, reason, or behavior causing a substantial deterioration of the person's previous ability to function independently").

[3]    The master indicated that the finding of probable cause to believe Randy was mentally ill was based on facts in the wife's petition that were reflected in the screening investigation report. The master noted that a domestic violence protective order had been issued on behalf of Randy's wife and that, while the screening investigation was pending, Randy was arrested because he brought weapons to the Anchorage airport, showed them to people there, and "made threatening statement[s] to personnel at the ticket counter."

[4]    The master indicated that the finding of probable cause to believe Randy was gravely disabled was based on allegations of Randy's symptoms of "severe and abnormal emotional and mental distress" and "[inability] to work or function as a parent or spouse."

### 1. Montgomery's Testimony

Montgomery testified as follows: Randy had "[b]ipolar disorder unspecified" and was experiencing a manic episode that could last indefinitely without medication. He was "quite grandiose" and believed his IQ was "so high that he broke the IQ test." He had delusions about being in the CIA and having "been hired to protect the brain of the [P]resident"; he "believed that the [P]resident came last night and visited him"; and he "had been speaking very frequently about a number of businesses that he is going to start," including "a drone company and something with gas pumps." He was "hyperverbal," which Montgomery defined as "talking a lot . . . and going on and on about things, speaking to a lot of different people," and he exhibited "[r]apid pressured speech," which she described as "the same thing, but you cannot stop them . . . and get a word in." He became irritable when mental illness or medication was discussed; he became agitated, yelled, and called Montgomery names when she spoke with him about the 30-day commitment petition; and he had been yelling, calling names at staff, and "putting his finger in staff members' faces and getting up close to them," necessitating a "show of support" in the form of additional staff members to redirect him back to his room.

Montgomery opined that Randy was gravely disabled and that he exhibited irrational behavior. But she also stated that Randy was able to take care of such needs as food and bathing without prompting at API and that his physical condition upon arrival reportedly was fine. However, she testified that he did not have a place to go and could not return home. She believed he would be able to secure a hotel room, but she did not believe he would be able to follow the rules at a hotel or a homeless shelter; she indicated that he reportedly "stayed in a hotel [that] summer and was banned from it for hiring someone to come in to teach him about sex, and he was disturbing other guests at the Marriott." She testified that according to his wife, he ran a business "from home

setting up clients to use credit card machines" and that he was no longer able to do that because his thoughts were too disorganized, which affected his ability to function and led to high-risk behaviors; on cross-examination, however, she testified that she did not know whether his business "[ran] itself" or whether he needed "to be there daily to manage [it]."

Although Montgomery testified that Randy likely could arrange for food and that she did not have concerns about his personal safety if he were released from API, she was concerned that "his bipolar symptoms [were] bad" and that "he would continue to decompensate" without treatment and "could then possibly be dangerous to someone or . . . could possibl[y] be hurt"; she opined that he would "continue to suffer his symptoms and they [would] get worse." She stated that it would not take him long to decompensate; he had "already decompensated to the point that he'[d] had two arrests [and] two restraining orders against him in the past two weeks," and during his short time at API he "decompensated . . . from the point of being pleasant and cooperative and grandiose, to posturing and yelling and calling names." She testified that he was unable to control himself, that he was "not behaving appropriately," and that he "offered to trade sex for an additional sandwich" at the API cafeteria. She thought that his decompensation at API was "very significant" and stated that she had previously considered releasing him but that his behavior then "began to escalate," that he was "getting worse," and that she expected it to continue.

Montgomery also opined that Randy had likely suffered from bipolar disorder for 10 to 15 years and had "started getting worse and worse" since July. "In August, he started spending uncontrollably and bought a very expensive car, very expensive gun, began staying in the Marriott, wanted to hire an assistant for $2,500 a week, and these sorts of things"; she testified that such spending is a "classic high-risk behavior." He engaged in "high-risk behaviors such as bringing guns to the airport,

threatening to kill someone at UPS, hiring someone to come and teach him about sex, spending recklessly, [and] advertising for threesomes."

She reported that at API Randy had taken some of his prescribed medication but then stopped taking it. When he did take it, it "seem[ed] to reduce his agitation" and helped him be "able to sleep for a few hours." She reported that he told her that he did "not believe that he has a mental health problem" and that he "said he's not going to take medication"; treatment by an outpatient provider therefore was not a feasible less restrictive alternative to commitment at API. She concluded that his condition would improve if he stayed at API for treatment but that it would continue if he were left untreated.

### 2. Randy's Testimony

Randy testified that he "would probably stay at the Marriott" if released from API and that he would be able to meet his basic needs because he had credit cards, "access to thousands of dollars," and "[r]esources . . . at [his] beck and call." He stated that he had multiple businesses, including a merchant services business and a drone company that he was developing, that he was about to buy and build a $15 million restaurant, and that he planned to "replicate [himself] in every 50 states and build a territory" and would "probably become the richest man in Alaska." He claimed that he was in charge of "millions of assets," including government assets, and that he had "very big deep brains." He also acknowledged that he was "maybe . . . a little rough on [his] family" and sometimes got mad.

On cross-examination Randy explained that his business involved fixing problems for his clients and that nobody in Alaska knows about LinkedIn; "I have LinkedIn connections from Beijing, China, family members that are — actually took care of me when I passed away." He testified that he had Yale and Harvard if he needed something and that he had "the biggest brain in the world to solve [his] problems."

When asked about being rough on his family, he responded that he would yell and scream but never touched them and that they loved him and "even dropped the charges against [him]." API's attorney also asked whether he met the President the other day, and Randy responded, "I didn't meet him the other day. He was in the room, but I knew he was there. I could hear his voice. He didn't want to meet me under that condition, but he was present." He testified that he protected the President when needed and helped the world leaders when they needed him. "I'm the biggest brain in the room, period, end of subject," he added.

Randy's testimony frequently digressed from answering the questions asked. For example, Randy testified that he thought he "broke the IQ machine at the government," was "super genius," and that his father built the atomic bomb, saved World War II, "was at the highest echelons of government," and "set in place a network of people [Randy] can resource any time in the government." He also interjected a series of testimonial statements while API's attorney was trying to end the cross-examination.

Randy repeatedly interrupted his own attorney's closing argument. He requested to be released on his "own recognizance," explaining that he would be "traveling all over the world" but promising to "inform the courts wherever [he was] at all times," to "be in any court," and to "not escape the law." While the master was trying to ask Randy's attorney a question, Randy interrupted to state the following:

> Misdemeanors. They can be expunged, the court dates can be met by lawyers, explanations be rendered, and graphics and videos and subpoenas can take care of everything. It's all available. I have this guy. Everybody's 8-balling me wherever I go. I — when they basically approached me at UPS, I backed away, threw my ID on, they took me into custody for my protective safe [sic]. I was released. President Obama met me afterwards. That's all you need to know. Need to know he's in town, he's out of town, a quick five hours away.

The master granted the 30-day commitment petition and told Randy that he appeared to "ha[ve] a lot to offer society once he gets his mental illness under control," in response to which Randy promised to create 5,000 new jobs in Alaska. Randy then reiterated his request to be released on his own recognizance and stated that he would "meet [his] family at [his] safe place at the Marriott" and that security would take care of his family if he needed them extracted.

## C. Findings And 30-Day Commitment Order

The master made oral findings at the hearing and recommended granting the 30-day commitment petition and the petition for court approval of administration of psychotropic medication. Written orders granting both petitions were distributed to the parties on October 19, 2016. A superior court judge signed the orders on October 20.

At the hearing the master stated that Randy "ha[d] a number of fixed false beliefs or deeply felt feelings or thoughts that, and frankly, some of these things are pretty impossible." The master expressed concern about the deterioration in Randy's condition and found that Randy suffered from a mental illness. The master stated that "the gravely disabled part [was] not the most compelling [he had] ever seen" but "agree[d] that [Randy's] ability . . . , at the present time, to follow the rules if released and so forth would be very questionable and potentially dangerous" and stated that he granted the petition for those reasons, based on the clear and convincing evidence standard. He noted Randy's intelligence and long history of not having mental issues and indicated that he believed "[Randy] [could] return to a prior state where he wouldn't be dangerous to himself or others."

On the written order for a 30-day commitment, the box for "gravely disabled" was marked and the box for "likely to cause harm to himself/herself or others" was left unmarked. The order listed a number of supporting facts, including the "diagnosis of bipolar disorder, observation, and recent treatment by psychiatric

professionals, plus the court-appointed scre[e]ning investigator's report." The order described Randy as "quite delusional and demonstrating dangerous manic behavior" and as a "seemingly . . . intelligent individual" who "lacks insight into his mental illness." The order noted that Randy's "current manifestations of mental illness reflect impaired judgment, bizarre behavior and speech, a high level of agitation, and hyperverbosity" and that Randy "ha[d] been charged with 3 crimes in the past 2 weeks."[5] The order also noted Montgomery's testimony about Randy's mental illness and need for treatment. And the order indicated that Randy's "family [was] very frightened by [his] verbal attacks, threats, and uncontrolled behavior."

Randy appeals. In his statement of points on appeal he lists issues relating both to the 30-day commitment order and the involuntary medication order. But in his briefing he abandons the challenge to the involuntary medication order[6] and focuses solely on the 30-day commitment order, arguing that the superior court erred in relying on facts not in evidence (specifically, the court-ordered screening investigation report) and that there was insufficient admitted evidence to support the conclusion that he was gravely disabled.

## III. STANDARD OF REVIEW

"We apply our independent judgment to the interpretation of the Alaska Constitution and statutes, adopting 'the rule of law that is most persuasive in light of

---

[5] We disregard the testimony that Randy had been charged with several crimes because we do not see any factual support for this finding. Any error in making this finding is harmless because there is ample support in the record for the court's remaining factual findings.

[6] *Cf. In re H.C.*, 956 P.2d 477, 480 n.7 (Alaska 1998) (interpreting *Kodiak Elec. Ass'n v. DeLaval Turbine, Inc.*, 694 P.2d 150, 153 n.4 (Alaska 1984) as "holding that even though the issue was included in appellant's points on appeal statement, the issue was abandoned because appellant failed to adequately brief it").

precedent, reason, and policy.' "[7] Factual findings in involuntary commitment proceedings are reviewed for clear error.[8] "[W]hether factual findings comport with the requirements of AS 47.30" is a legal issue subject to de novo review.[9]

## IV. DISCUSSION

Mental illness alone is insufficient to form a constitutionally adequate basis for involuntary commitment. The United States Supreme Court has admonished that, in light of the constitutional right to liberty involved, a person may not be involuntarily committed based on mental illness alone if he or she is "dangerous to no one and can live safely in freedom."[10] Under AS 47.30.735(c), a 30-day involuntary commitment requires a "find[ing], by clear and convincing evidence, that the respondent is mentally ill and as a result is likely to cause harm to the respondent or others or is gravely disabled." Whether Randy was likely to cause harm to himself or others is not an issue in this case[11] because the superior court based its commitment order solely on a finding of grave disability.

---

[7]    *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 375 (Alaska 2007) (footnotes omitted) (quoting *Guin v. Ha*, 591 P.2d 1281, 1284 n.6 (Alaska 1979)).

[8]    *Id.*

[9]    *Id.*

[10]    *O'Connor v. Donaldson*, 422 U.S. 563, 573-76 (1975).

[11]    Undoubtedly, the wife's allegations in the initial petition, the wife's and the 13-year-old daughter's statements in the screening investigation report, and the screening investigation report itself suggest that Randy was likely to cause harm to himself or others. However, none of this was in evidence, and the superior court made no finding that Randy was likely to cause harm to himself or others. The master implied such a finding when he stated at the hearing that he believed "[Randy] can return to a prior state where he wouldn't be dangerous to himself or others," but the subsequent commitment order was based solely on grave disability and not on danger to self or others.

Under AS 47.30.915(9) "gravely disabled" is

a condition in which a person as a result of mental illness

> (A) is in danger of physical harm arising from such complete neglect of basic needs for food, clothing, shelter, or personal safety as to render serious accident, illness, or death highly probable if care by another is not taken; or

> (B) will, if not treated, suffer or continue to suffer severe and abnormal mental, emotional, or physical distress, and this distress is associated with significant impairment of judgment, reason, or behavior causing a substantial deterioration of the person's previous ability to function independently . . . .

In *Wetherhorn v. Alaska Psychiatric Institute*, we clarified that to be found gravely disabled under subsection (B), an individual must be "helpless to avoid the hazards of freedom either through his own efforts or with the aid of willing family members or friends."[12] We further described grave disability as a condition where the individual is "so unable to function that he or she cannot exist safely outside an institutional framework due to an inability to respond to the essential demands of daily life."[13]

As further protection of the liberty interests involved, AS 47.30.735(c) mandates a clear and convincing evidence standard.[14] In *In re Stephen O.*, we noted that this standard of proof requires "a firm belief or conviction about the existence of a fact to be proved."[15] We explained that this heightened standard of proof "is one way to

---

[12] 156 P.3d at 376 (quoting *O'Connor*, 422 U.S. at 574 n.9).

[13] *Id.*

[14] *Id.* at 378.

[15] 314 P.3d 1185, 1192-93 (Alaska 2013) (quoting *In re Johnstone*, 2 P.3d
(continued...)

impress the factfinder with the importance of the decision and thereby perhaps to reduce the chances that inappropriate commitments will be ordered."[16] And we emphasized that "[s]uch caution is required in involuntary commitment cases because of the great 'importance of the liberty right involved' and the 'massive curtailment of liberty' that such commitments entail."[17]

Initially, Randy contends that the screening investigation report was not admitted into evidence and the master's reliance on it violated his due process rights. Although the screening investigation report had been ordered by the court and provided to the parties, it was not admitted into evidence and should therefore not have been relied on independently by the master. However, Montgomery stated at the hearing that she had reviewed the screening investigation report, had spoken with Randy's wife and daughter, and was basing her opinion, at least in part, on the report and their statements. Montgomery, as an expert witness, was entitled to review the screening report and interview the family.[18] She testified, without any hearsay or foundational objections, to matters in the report and to what she was told. She was able to do so to explain her professional opinion that Randy was gravely disabled, and the master did not err in relying on her testimony. Because Montgomery, as an expert witness, could permissibly rely on information from the screening investigation report and her interview with the

---

[15](...continued)
1226, 1234 (Alaska 2000)).

[16]    *Id.* at 1193 (quoting *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d at 377 n.26 (Alaska 2007)).

[17]    *Id.* (quoting *Wetherhorn*, 156 P.3d at 375-77).

[18]    *See* Alaska R. Evid. 703 (explaining that experts may rely on facts or data not otherwise admissible, as long as they are of the type reasonably relied upon by experts in the field).

family, and because Randy waived any objection to her testimony for other purposes by not objecting, it was not error for the master and the court to rely on Montgomery's testimony. Further, Randy's due process rights were not violated by Montgomery's expert testimony regarding the screening investigation report.[19] Randy had been provided a copy of the screening report and had an opportunity to cross examine Montgomery at the hearing; he also could have called as witnesses in his case-in-chief the author of the screening report and his wife and daughter.

The master and the court did not err in concluding Randy was gravely disabled. The master's written findings, adopted by the court, state:

> diagnosis of bipolar disorder, observation, and recent treatment by psychiatric professionals . . . . Responden[t] is quite delusional and demonstrating dangerous manic behavior. His current manifestations of mental illness reflect impaired judgment, bizarre behavior and speech, a high level of agitation, and hyperverbosity. He has been charged with 3 crimes in the past 2 weeks. While seemingly an intelligent individual, respondent lacks insight into his mental illness. Dr. Montgomery testified in detail about respondent's mental illness and the need for treatment.

These written findings are all supported by information that was properly before the court, and taken together, the evidence supports the finding of grave disability.

It is true that there is some evidence favoring Randy's "ability to function independently and live outside of a controlled environment."[20] Montgomery testified that Randy was reportedly in fine physical condition upon arrival at API, that he was able to take care of such needs as food and bathing without prompting at API, and that he

---

[19] *Gottstein v. State, Dep't of Nat. Res.*, 223 P.3d 609, 622 (Alaska 2010) ("[D]ue process requires notice and an opportunity to be heard.").

[20] *In re Stephen O.*, 314 P.3d 1185, 1195 (Alaska 2013).

would be able to arrange for food if released from API. She testified that he could not return home and did not have a place to go, but that he would be able to secure a hotel room.

However, although Montgomery thought he would be able to secure a hotel room in the first place, she did not believe he would be able to follow the rules at a hotel or a homeless shelter, and she testified that he had already been banned from a hotel "for hiring someone to come in to teach him about sex" and for disturbing other guests. His ability to function independently was further called into question by his "high-risk behaviors such as bringing guns to the airport, threatening to kill someone at UPS, . . . spending recklessly, [and] advertising for threesomes."

Although Montgomery testified that she did not have concerns about his personal safety if he were released from API, she then proceeded to express concern about the severity of his symptoms and testified that he would continue to decompensate without treatment and "could then possibly be dangerous to someone or . . . could possibl[y] be hurt." She testified that he suffered from bipolar disorder and had been decompensating since July and that during his short time at API he "decompensated . . . from the point of being pleasant and cooperative and grandiose, to posturing and yelling and calling names." She explained that he was unable to control himself, that he was "not behaving appropriately," and that he "offered to trade sex for an additional sandwich" at the API cafeteria, which she did not think was normal behavior for him. She described his decompensation at API as "very significant." She testified that he was in a manic state that would last indefinitely without treatment and that he would "continue to suffer his symptoms and they [would] get worse." She also testified that he told her that he did "not believe that he has a mental health problem" and that he "said he's not going to take medication."

Thus, the evidence properly before the court shows "a substantial deterioration of [Randy's] previous ability to function independently" and that Randy's condition would continue if not treated.[21] It also shows that he lacked the ability to "exist safely outside an institutional framework"[22] due to his high-risk behaviors and inability to retain housing.

Because the clear and convincing evidence standard is satisfied, we affirm the decision of the superior court granting the 30-day commitment order.

## V.    CONCLUSION

We AFFIRM the superior court's order of commitment.

---

[21]    AS 47.30.915(9)(B).

[22]    *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d at 376 (Alaska 2007).