*Notice: This opinion is subject to correction before publication in the Pacific Reporter. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Necessity for the Hospitalization of ) | Supreme Court No. S-18326 |
| ) | |
| SERGIO F. ) | Superior Court No. 3AN-21-03051 PR |
| ) | |
| ) | O P I N I O N |
| ) | |
| ) | No. 7654 – May 12, 2023 |
| ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Adolf V. Zeman, Judge.

Appearances: George W.P. Madeira, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Sergio F. Adam Carman, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for State of Alaska.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

WINFREE, Chief Justice.

## I. INTRODUCTION

After a man's persistent religious delusions led him to walk naked along a road during the winter, he was taken into emergency custody. The superior court ordered his evaluation at a treatment facility, and after a post-evaluation petition and a hearing the court involuntarily committed him for up to 30 days of treatment. After yet a subsequent petition and a hearing, the superior court ordered a 90-day involuntary

commitment to the treatment facility, finding, by clear and convincing evidence, that the man was gravely disabled, that the man needed additional treatment, and that the facility was an appropriate treatment facility. The man argues on appeal that we should vacate the superior court's 90-day commitment order because there was insufficient evidence to show he was gravely disabled and because the court failed to grapple with and determine whether his commitment to the treatment facility was, by clear and convincing evidence, the least restrictive alternative for his treatment. We agree with his latter argument and vacate the commitment order.

## II.    FACTS AND PROCEEDINGS

### A.    Detention And Emergency Custody

In late December 2021 police encountered Sergio F.[1] walking naked up O'Malley Road toward the mountains near Anchorage. The police transported Sergio to a hospital emergency department and an officer filed a petition for Sergio's emergency detention and evaluation.[2] The superior court authorized Sergio's

---

[1]    We use a pseudonym to protect Sergio's privacy.

[2]    *See* AS 47.30.705(a) (permitting, among others, peace officer "who has probable cause to believe that a person is gravely disabled or is suffering from mental illness and is likely to cause serious harm to self or others . . . [to] cause the person to be taken into custody . . . and delivered to the nearest . . . evaluation facility" under certain circumstances); AS 47.30.710 (requiring mental health professional to perform emergency examination within 24 hours of respondent's detention under AS 47.30.705 and to apply for ex parte order authorizing hospitalization for evaluation under AS 47.30.700 if one has not yet been obtained); AS 47.30.700 (permitting any adult to petition for ex parte order for mental health evaluation of individual who is "reasonably believed to present a likelihood of serious harm to self or others or is gravely disabled as a result of mental illness"); *see also In re Hospitalization of Gabriel C.*, 324 P.3d 835, 837 (Alaska 2014) ("After a person is detained by a police officer and brought to an evaluation facility, a physician and a mental health professional must conduct an emergency evaluation within 24 hours. If warranted, the mental health professional may apply for an ex parte order authorizing hospitalization for a full evaluation." (internal footnotes omitted)).

hospitalization for an evaluation[3] and he was transferred to Alaska Psychiatric Institute (API), where he was diagnosed with schizoaffective disorder.[4] API staff petitioned for an order for Sergio's 30-day involuntary commitment for treatment and a hearing on the petition was held before a superior court master.[5]

### B.    30-Day Commitment Hearing

Neither Sergio nor the State provided us with a transcript of the hearing, but witnesses at the 30-day commitment hearing apparently included Sergio's mother, stepmother, and father, Sergio's API psychiatrist, and Sergio. Written findings and a recommendation that Sergio be involuntarily committed for up to 30 days for treatment were signed by the master that day.

The master found that, at baseline, Sergio was able "to manage his affairs [and] hold a job" but that, in his current state, Sergio was "delusional" and "risk[ed] his health by prolonged fasting" and exposure to freezing temperatures without clothes. The master also found that Sergio acknowledged his mental illness and was willing to take medication. The master concluded that there was clear and convincing evidence

---

[3]    *See* AS 47.30.700(a) (permitting court to grant ex parte order for hospitalization for mental health evaluation upon showing of probable cause that "respondent is mentally ill and that condition causes the respondent to be gravely disabled or to present a likelihood of serious harm to self or others").

[4]    Schizoaffective disorder is "an illness manifested by an enduring major depressive, manic, or mixed episode along with delusions, hallucinations, disorganized speech and behavior, and negative symptoms of schizophrenia. In the absence of a major depressive, manic, or mixed episode, there must be delusions or hallucinations for several weeks." *Schizoaffective disorder*, STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

[5]    *See* AS 47.30.730 (setting out procedure for health care professionals conducting mental health evaluation under AS 47.30.710 to file petition for 30-day commitment for treatment); AS 47.30.735 (providing for court hearing on petition for 30-day commitment for treatment and setting out required findings for commitment).

that Sergio was gravely disabled, that Sergio was unable "to stay safe in an uncontrolled environment," and that no less restrictive facility would adequately protect Sergio and the public, and the master recommended that the superior court order Sergio to be committed to API for up to 30 days for treatment. The superior court approved the recommendation and issued the commitment order. Sergio did not appeal that order.

### C. 90-Day Commitment Hearing

Dr. Joseph Pace, Sergio's treating psychiatrist at API, later filed a petition for an order for Sergio's involuntary 90-day commitment for treatment,[6] asserting that Sergio remained gravely disabled and posed a risk of serious harm to himself and others and that his condition could be improved with a continued course of treatment at API. The petition referred to Sergio's continued "messianic delusions," Sergio's statement that he wanted to gamble all his money on a football game, and Sergio's plan to live with a man who worked at a cannabis business despite Sergio's current psychosis allegedly having been triggered by his marijuana use. A master held a hearing on the petition; only Dr. Pace and Sergio testified.

#### 1. Dr. Pace's testimony

Dr. Pace testified that Sergio's schizoaffective disorder diagnosis had not changed since the earlier hearing and that Sergio was experiencing religious delusions and believed he was meant to "fulfill prophecies." According to Dr. Pace, the "major" issues were Sergio's religious delusions and lack of insight into his mental illness. Dr. Pace's primary concern was that Sergio, if released, would attempt to "fulfill" prophecies and likely would suffer harm as a result — for instance, by prolonged fasting or going out naked into the cold again.

---

[6] *See* AS 47.30.740, .750, .755 (setting out procedure for treating professionals to petition court for additional 90 days commitment for further treatment); AS 47.30.745 (providing for court hearing, including jury trial option, on petition for 90-day commitment and setting out required findings for commitment order).

Dr. Pace noted some improvements in Sergio's condition. He testified that Sergio was maintaining hygiene and eating enough food. He stated that, as of the hearing, Sergio had been taking an antipsychotic medication for several weeks and recently had received an injection of the drug that would persist in his system for a month. Dr. Pace said that the medicine had begun to have some positive effects.

Dr. Pace nonetheless concluded that continued commitment for further treatment was necessary. He noted that Sergio's religious delusions and thought processes remained largely the same even with the recent medication because the medication can take several weeks to become effective. He expressed concern about Sergio's judgment and ability to provide for his needs outside a controlled environment. He explained that Sergio had cut himself off from his parents' support due to his delusional behavior and that Sergio demonstrated poor judgment by wanting to bet all his money on a football game. According to Dr. Pace, these behaviors likely would recur because Sergio had not "really improved sufficiently to . . . not follow the lines of his delusion or hallucination." Dr. Pace stated that it could take up to "two or three months" for the antipsychotic medication to take full effect, and that commitment was necessary so Sergio could stabilize on his medication, or switch to a new one if needed, in a controlled, supervised environment where he would be safe.

The master then queried about options other than involuntary hospitalization: "I'm wondering . . . if there's a better way to address making sure [Sergio] takes his medications and making sure he . . . retrieves his baseline which is a functional, employable, stable person." The master stated that "committing [Sergio] for 90 days so that he can have three shots" and then be discharged seemed "like an expensive thing to do." The master asked whether receiving medication through outpatient treatment could be an option if Sergio were released.

Dr. Pace responded that Sergio was eligible to receive outpatient care through the Alaska Native health care system, but that Sergio would be unsupervised at his friend's home between appointments. Dr. Pace testified that he did not believe

Sergio's needs could be met in a less restrictive setting "because of the lack of ability to kind of monitor what he's up to and that he doesn't go off and do something unsafe." Dr. Pace expressed concern that "he'd be on his own to . . . fulfill his religious mission."

### 2. Sergio's testimony

Despite having acknowledged his mental illness at the earlier hearing, Sergio denied having a mental health issue, calling it an "unexplained diagnosis." He admitted having religious preoccupations, but when asked whether he wanted Dr. Pace to help him not be preoccupied with religious things, Sergio said "[n]o." He said that, if released, he would not "go streaking naked again," did not intend to go into the wilderness immediately, and would not use marijuana. He stated that he would continue taking the antipsychotic medicine if released and could receive treatment at Alaska Native Medical Center (ANMC). He said that the medicine was helping him to not overeat and to sleep better and that he was not opposed to taking medications. He later expressly stated: "I'm completely willing to take [the medicine]." He also testified that, if released from API, he would go to his friend's house or to the shelter. He said that his friend could offer him a job in a restaurant kitchen, in addition to a place to stay. But he also stated that he did not know if his friend was back in town yet after a trip. Throughout the hearing Sergio repeatedly made religious references and interrupted the proceedings.

### 3. Commitment order and appeal

The master stated at the end of the hearing that "this is one of the closest cases [she had] encountered recently." The master found, by clear and convincing evidence, that Sergio had a mental illness and was gravely disabled. The master said she wished there were "a more effective, efficient cost saving way that is more humane to this patient than to continue to keep him hospitalized," and that "it would be inhumane at this point in time to discharge [him] to the street . . . because of his grave disability"; without stating a level of proof, she also found that there was no treatment alternative "reasonably available right now that can help him."

The master's subsequent written order stated that she found, by clear and convincing evidence, that Sergio was mentally ill and gravely disabled and that API "is an appropriate treatment facility." The master included a proposed order for the superior court to sign based on the findings. The superior court approved the master's recommendation and signed the order for Sergio's 90-day commitment for further treatment at API.

Sergio appeals the 90-day commitment order, contending that the superior court clearly erred by finding, by clear and convincing evidence, that he was gravely disabled and erred by failing to find, by clear and convincing evidence, that no less restrictive alternative to API was feasible and available for his continuing treatment. We address only Sergio's latter argument because it is dispositive.

## III. STANDARD OF REVIEW

Whether factual findings meet statutory standards for involuntary commitment is a question of law to which we apply our independent judgment.[7]

## IV. DISCUSSION

### A. Legal Framework

We have "characterized involuntary commitment for a mental illness as a 'massive curtailment of liberty' that demands due process of law."[8] A court may issue an order committing an individual to a treatment facility for a 30-day period only if two conditions are established.[9] First, the court must find, "by clear and convincing evidence, that the [respondent] is mentally ill and as a result is likely to cause harm to

---

[7]    *In re Hospitalization of Naomi B.*, 435 P.3d 918, 923-24 (Alaska 2019) (quoting *In re Hospitalization of Jacob S.*, 384 P.3d 758, 763-64 (Alaska 2016)).

[8]    *Id.* at 931 (quoting *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 375-76 (Alaska 2007), *overruled on other grounds by In re Naomi B.*, 435 P.3d 918)).

[9]    AS 47.30.735(c)-(d).

[self] or others or is gravely disabled."[10]  Second, the court must determine that clear and convincing evidence shows no feasible less restrictive alternative to involuntary commitment exists.[11]

"At any time during the respondent's 30-day commitment, [authorized facility staff] may file with the court a petition for a 90-day commitment of that respondent."[12]  After a hearing, "the court may commit the respondent to a treatment facility for no more than 90 days if the court . . . finds by clear and convincing evidence that the respondent is mentally ill and as a result is likely to cause harm to [self] or others, or is gravely disabled,"[13] and that no less restrictive alternative exists.[14]

"An important principle of civil commitment in Alaska is to treat persons 'in the least restrictive alternative environment consistent with their treatment needs.' "[15]  "[F]inding that no less restrictive alternative exists is a constitutional

---

**10**    *In re Naomi B.*, 435 P.3d at 931 (quoting AS 47.30.735(c)).

**11**    *Id*. at 932 (explaining that AS 47.30.735(d) and AS 47.30.755(b) "authorize commitment only if no feasible less restrictive alternative treatment is available").

**12**    AS 47.30.740(a); *In re Jacob S.*, 384 P.3d at 768 (stating requirements for 30-day involuntary commitment carry over to 90-day petition).

**13**    AS 47.30.755(a).

**14**    *In re Hospitalization of Mark V.*, 375 P.3d 51, 58 (Alaska 2016) ("[A] petitioner must prove, by clear and convincing evidence, the petition's allegation that there are no less restrictive alternatives."), *abrogated by In re Naomi B.*, 435 P.3d 918. We explained in *Mark V.* that the least restrictive alternative requirement is a statutory protection against unconstitutional commitment, citing AS 47.30.730(a)(2) and AS 47.30.735(d). *Id*. We noted that "the 'clear and convincing evidence' standard is not expressly extended by statute" to the least restrictive alternative finding, but held that clear and convincing evidence is the required standard. *Id*. at n.31.

**15**    *In re Hospitalization of Joan K.*, 273 P.3d 594, 601 (Alaska 2012) (quoting AS 47.30.655(2)).

prerequisite to involuntary hospitalization."[16] We have explained that "the trial court's deliberate consideration of [whether less restrictive alternatives exist] is critical to the protection of the respondent's liberty interests."[17] It is the State's burden to prove, by clear and convincing evidence, that there are no less restrictive alternatives to commitment.[18] A less restrictive alternative must be feasible, available,[19] and provide "adequate treatment" for a respondent.[20]

### B. Least Restrictive Alternative Treatment Analysis

Sergio contends that the superior court's written 90-day commitment order "failed to determine whether an adequate less-restrictive alternative existed." The State concedes that the superior court made no explicit determination about a less restrictive alternative, noting that "neither the 90-day commitment order nor the master's findings from the hearing use the key term 'least restrictive alternative.' " The State maintains that the master nonetheless inquired about less restrictive alternatives and that the superior court made an "implicit finding" that no less restrictive alternative existed. According to the State, the omission of the "key term" was harmless error because the record supports the conclusion that involuntary commitment was the least restrictive alternative. Sergio responds that the superior court's omission of a least restrictive alternative analysis was not harmless and that there was not clear and convincing evidence to support a finding that no less restrictive alternative was available.

---

[16]    *In re Naomi B.*, 435 P.3d at 933 (quoting *In re Mark V.*, 375 P.3d at 59).

[17]    *In re Mark V.*, 375 P.3d at 58.

[18]    *In re Naomi B.*, 435 P.3d at 934.

[19]    *Id.* at 932; AS 47.30.735(d).

[20]    *In re Hospitalization of Danielle B.*, 453 P.3d 200, 204 (Alaska 2019) (quoting *In re Hospitalization of Jacob S.*, 384 P.3d 758, 768 (Alaska 2016)).

The lack of specific findings about possible less restrictive alternatives in this case is particularly concerning because we have explained that "the trial court's deliberate consideration of [whether less restrictive alternatives exist] is critical to the protection of the respondent's liberty interests."[21] The State attempts to alleviate this concern with two primary arguments: that involuntary commitment to API was necessary because (1) a finding of "gravely disabled" presupposes an inability to live outside of a controlled environment and (2) Sergio's suggested discharge plan was inadequate.

### 1. Effect of grave disability finding

The State argues that because the superior court found that Sergio was gravely disabled, involuntary commitment was "necessarily the least restrictive alternative." The State quotes our statement in *In re Hospitalization of Connor J.* that a gravely disabled finding "presupposes an inability to 'live safely outside of a controlled environment.' "[22] But a gravely disabled finding presupposes only an inability to live safely outside of a controlled environment *without treatment.*[23] This is distinct from the least restrictive alternative analysis, which is concerned with the respondent's ability to live in the community *with* treatment. In *In re Connor J.* we expressly considered the gravely disabled respondent's ability to be treated without hospitalization and concluded that "there was no evidence" the "treatment objectives could be achieved anywhere else" but the proposed psychiatric hospital and that the superior court could rely on expert testimony that outpatient services "were not a

---

[21] *In re Mark V.*, 375 P.3d at 58.

[22] 440 P.3d 159, 166 (Alaska 2019) (quoting *In re Hospitalization of Stephen O.*, 314 P.3d 1185, 1195 (Alaska 2013)).

[23] *See id.* at n.19 (referencing statutory definitions of "gravely disabled" identifying condition resulting from mental illness "if not treated" (AS 47.30.915(9)(B)) or "if care by another is not taken" (AS 47.30.915(9)(A))).

realistic option."[24] Following the State's approach would, contrary to our previous holdings, render the least restrictive alternative analysis superfluous.[25]

### 2. Sergio's proposed discharge plan

The parties' primary dispute is whether Sergio's proposed discharge plan was an adequate alternative to inpatient hospitalization. Sergio argues that his suggested alternative of staying with a friend and obtaining outpatient treatment at ANMC was a feasible and available less restrictive alternative. The State responds that Sergio's discharge plan would not meet his treatment needs or keep him safe. The master made no explicit findings about whether Sergio would be able to live safely at his friend's house, stating only that "it would be inhumane at this point in time to discharge this patient to the street." The superior court made no findings or conclusions on this point.

The State refers to Dr. Pace's testimony that Sergio's plan to live with his friend was inadequate because Sergio would lack the necessary supervision to ensure he did not do something unsafe in response to his delusions. Dr. Pace also testified that Sergio required treatment in a supervised environment until his medication stabilized. Sergio argues in response that the master considered his plan to stay with his friend and receive outpatient treatment to be "not an unreasonable" plan. He contends that the medication would have been in his system for one month; that he was willing to take medications and access outpatient care; and that he could successfully access outpatient care if released. He asserts that the superior court's determination was insufficiently supported, pointing to the master's "conclusory" statement: "I wish there was . . . a

---

**24** *Id.* at 166-67.

**25** *See, e.g.*, *In re Mark V.*, 375 P.3d at 58-59 ("[The least restrictive alternative requirement] is not a secondary concern, nor is it . . . something to be considered only after the court has decided that the respondent should be committed. Finding that no less restrictive alternative exists is a constitutional prerequisite to involuntary hospitalization.").

more effective, efficient cost saving way that is more humane to this patient than to continue to keep him hospitalized . . . but there isn't anything reasonably available right now that can help him."

The adequacy of Sergio's discharge plan was a factual determination to be resolved by considering conflicting testimony. Perhaps the master, and thus the superior court, implicitly found that the discharge plan was inadequate. We could so assume, and we then could determine whether that finding is clearly erroneous. But doing so would not be dispositive of the larger question whether the State proved, by clear and convincing evidence, that *no* feasible less restrictive alternative was available. This is a legal question to which we apply our independent judgment.

### 3. Consideration of alternative treatment options

The record does not reflect that the State discussed or explored *any* alternatives beyond Sergio's suggested discharge plan. But it is not a respondent's burden to prove the existence of less restrictive alternatives and outside support.[26] The burden lies with the State to prove the contrary.[27] The State argued that Sergio's plan was inadequate, but the standard is not whether the alternative suggested by a respondent is suitable; the standard is whether clear and convincing evidence supports the State's position that *no* less restrictive alternative is available.

---

[26] *Id.* at 56 ("We decline to place this burden on the respondent.").

[27] *Id.* at 58 ("[W]e hold that a petitioner must prove, by clear and convincing evidence, the petition's allegation that there are no less restrictive alternatives."). The State asserted during the hearing that it met this burden because Sergio had experienced two recent hospitalizations and subsequently went to a homeless shelter: "the fact that [Sergio] went to the shelter once [proves that] we tried less restrictive and it didn't work." But consideration of less restrictive alternatives requires more than repeatedly discharging respondents to homeless shelters.

The State need not "prove the unavailability of every imaginable alternative."[28]  But the State's failure to explore even *a single* alternative outpatient treatment option (beyond Sergio's plan) suggests that the State did not meet its burden of proving, by clear and convincing evidence, that there were no less restrictive alternatives.[29]  This is a substantial burden commensurate with the "massive curtailment of liberty" imposed by involuntary commitment.[30]

The opportunity to explore this issue at a commitment hearing seems readily available.  As required by statute,[31] the petition in this case, signed by Dr. Pace, contained two salient paragraphs:

> Commitment in a treatment facility is appropriate because evaluation staff have considered but not found any less restrictive alternative that would adequately protect the respondent and the public and meet the respondent's treatment needs.
>
> . . . .
>
> [API] is an appropriate treatment facility for the respondent's condition and has agreed to accept the respondent.  The evaluation staff has considered, but has not

---

[28]     *In re Hospitalization of Vern H.*, 486 P.3d 1123, 1131 n.31 (Alaska 2021) (holding in context of emergency detention for evaluation that State must consider less restrictive alternatives to jail).

[29]     *See In re Hospitalization of Luciano G.*, 450 P.3d 1258, 1271 (Alaska 2019) (Stowers, J., dissenting) ("[I]t is illogical and insufficient for a doctor to opine that there are no less restrictive alternatives when the doctor has done *nothing* to evaluate any less restrictive alternatives." (emphasis in original) (quoting *In re Hospitalization of Joan K.*, 273 P.3d 594, 606 (Alaska 2012) (Stowers, J., dissenting))).

[30]     *In re Hospitalization of Naomi B.*, 435 P.3d 918, 928 (Alaska 2019) (quoting *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 375 (Alaska 2007), *overruled on other grounds by In re Naomi B.*, 435 P.3d 918).

[31]     AS 47.30.740(a) (incorporating AS 47.30.730(a)(2)'s 30-day petition requirements and requiring allegation that evaluation staff considered less restrictive alternatives).

found, any less restrictive alternatives available that would adequately protect the respondent or others.

The obvious questions to ask Dr. Pace at the hearing were: What less restrictive alternatives were considered and why were those alternatives inadequate to protect Sergio and the public and provide for Sergio's treatment needs? Courts regularly engage in this type of inquiry,[32] although the failure to expressly consider specific outpatient options might be harmless error when a respondent is so violent, incapacitated, or uncooperative that inpatient treatment is clearly the only option.[33] But Sergio was taking care of his basic needs and was coherently engaged in discussing discharge options, and the master found that he was not dangerous and was willing to continue taking medication and seek outpatient treatment.[34]

---

[32]     *See, e.g.*, *In re Naomi B.*, 435 P.3d at 934 (affirming commitment was least restrictive option when "the parties explored several possible alternatives, including outpatient community support and assisted living facilities" and "none of the proposed less restrictive alternatives would protect the public 'from the danger to others that [respondent poses] and that [respondent] needed a facility like API that is locked and . . . provides 24/7 care' "); *In re Hospitalization of Duane M.*, No. S-16885, 2020 WL 1165853, at *8 (Alaska Mar. 11, 2020) (noting "various substance abuse treatment programs" and "different housing options" had been considered but were unable to take respondent); *In re Hospitalization of Marvin S.*, No. S-16899, 2019 WL 2880963, at *7 (Alaska July 3, 2019) (explaining why outpatient options would be unsuitable).

[33]     In *In re Hospitalization of Rabi R.*, 468 P.3d 721 (Alaska 2020), the superior court did not expressly consider outpatient options, but we nonetheless affirmed involuntary commitment as the least restrictive option because the respondent's "overall condition" required commitment when he refused to take medication needed for recovery, believed he did not need treatment, and was likely to deteriorate. *Id.* at 735-36; *see also In re Luciano G.*, 450 P.3d at 1264-65 (affirming commitment as least restrictive option despite superior court's failure to consider specific outpatient options because respondent was unwilling to engage in discharge planning and would not seek treatment if not committed).

[34]     *Compare In re Hospitalization of Stephen O.*, 314 P.3d 1185, 1195 (Alaska 2013) (holding respondent's "willingness to get treatment . . . demonstrates his ability to reason and make autonomous choices, contrary to the involuntary

Neither the parties nor the master engaged in the specific inquiry required to address the petition's allegations that less restrictive alternatives were considered by the treatment facility and rejected. And Sergio does not point us to anything suggesting he urged the superior court to consider and reject the master's findings and recommendation on this point. We reiterate that less restrictive alternatives to hospitalization in a secure, locked facility must be considered before ordering involuntary commitment and that it is the State's burden — not the respondent's contrary burden — to show that those alternatives do not exist or are not feasible. That did not happen in this case, and we decline the State's invitation to scour the record for scraps of information to support a finding, by clear and convincing evidence, that was not made by the superior court.

## V.   CONCLUSION

For the reasons stated above, we VACATE the 90-day commitment order.

---

commitment ordered"), *with In re Rabi R.*, 468 P.3d at 735-36 (affirming commitment as least restrictive option when respondent refused to take medication needed for recovery and believed he did not need treatment), *In re Hospitalization of Jacob S.*, 384 P.3d 758, 768-69 (Alaska 2016) (holding same when superior court found respondent was unlikely to take medication if released), *In re Luciano G.*, 450 P.3d at 1264-65 (holding same when respondent was unwilling to engage in discharge planning and would not seek treatment if not committed), *In re Hospitalization of Mark V.*, 375 P.3d 51, 59-60 (Alaska 2016) (holding same when respondent believed he did not need medication), *In re Hospitalization of Danielle B.*, 453 P.3d 200, 203-04 (Alaska 2019) (holding same when psychiatrist and respondent testified that respondent would not participate in proposed outpatient treatment), *and In re Hospitalization of Connor J.*, 440 P.3d 159, 165-67 (Alaska 2019) (holding same when respondent refused medication on an outpatient basis and was refusing medication at time of hearing).