*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Necessity for the Hospitalization of | ) ) ) | Supreme Court No.  S-18050 |
| KARA K. | ) ) | Superior Court No.  3AN-21-00657 PR |
| | ) ) | O P I N I O N |
| | ) ) | No. 7715 – August 30, 2024 |
| | ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Dani Crosby, Judge.

Appearances:  Rachel Cella, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Kara K. Laura Wolff, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for State of Alaska.

Before:  Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

PATE, Justice.

## I.     INTRODUCTION

A woman experiencing psychotic delusions was admitted to the Alaska Psychiatric Institute (API) for a mental health evaluation.  The woman's treating psychiatrist identified three possible causes of the woman's delusions, one of which was psychosis secondary to lupus.  The superior court ordered a 30-day involuntary

commitment, concluding there was clear and convincing evidence that the woman was gravely disabled as a result of mental illness.

On appeal the woman urges us to vacate the 30-day commitment order because the court failed to "rule out" the possibility that her psychosis was caused by lupus. Based on this premise the woman argues that her involuntary commitment to API was not the least restrictive alternative treatment. We disagree and affirm the commitment order.

## II. FACTS AND PROCEEDINGS

### A. First And Second Admissions To API

In March 2021 Kara K.[1] was admitted to API. The treating psychiatrist at API did not believe Kara met the criteria for involuntary commitment at that time because she showed signs of improvement while taking prescribed antipsychotic medication. Although the psychiatrist strongly recommended that Kara stay at API for further treatment, Kara declined and was discharged against medical advice.

Five days later Kara was taken into emergency detention at a hospital.[2] The next day a hospital social worker filed a petition for evaluation, which the superior

---

[1]     We use a pseudonym to protect Kara's privacy.

[2]     *See* AS 47.30.705(a) (providing that authorized individual "who has probable cause to believe that a person is gravely disabled or is suffering from mental illness and is likely to cause serious harm to self or others of such immediate nature that considerations of safety do not allow initiation of involuntary commitment procedures . . . may cause the person to be taken into custody . . . and delivered to the nearest crisis stabilization center, crisis residential center, evaluation facility, or treatment facility").

court granted.[3] Kara was transported to API where the same treating psychiatrist evaluated her for a second time.[4]

## B.    30-Day Commitment Proceedings

API staff subsequently petitioned the superior court for a 30-day involuntary commitment order.[5] A standing master held a commitment hearing in April 2021.[6] The treating psychiatrist was the only witness. Kara was present, but declined to testify.

### 1.    Testimony by the treating psychiatrist

After being qualified as an expert in psychiatry, the psychiatrist testified that he had come to a "provisional" diagnosis of "bipolar I disorder . . . mixed with psychotic features." The psychiatrist explained his diagnosis was "provisional" because Kara had not displayed "a psychotic illness long enough to be certain that [it was] not schizophrenia . . . or schizoaffective disorder."

---

[3]    *See* AS 47.30.700(a) (providing that "[u]pon petition of any adult, a judge shall immediately conduct a screening investigation or direct a local mental health professional . . . to conduct a screening investigation of the person alleged to be mentally ill and, as a result of that condition, alleged to be gravely disabled or to present a likelihood of serious harm to self or others"); *see also* AS 47.30.710(a) (providing that "[a] respondent who is delivered under AS 47.30.700–47.30.705 to an evaluation facility for emergency examination and treatment shall be examined and evaluated as to mental and physical condition by a mental health professional and by a physician within 24 hours after arrival at the facility").

[4]    *See* AS 47.30.715 (providing that "[w]hen an evaluation facility receives a proper order for evaluation, it shall accept the order and the respondent for an evaluation period not to exceed 72 hours" and also requiring court to schedule 30-day commitment hearing if needed).

[5]    *See* AS 47.30.730 (providing that commitment petition "must be signed by two mental health professionals who have examined the respondent, one of whom is a physician").

[6]    *See* AS 47.30.735 (describing procedures applicable to 30-day commitment hearing and providing respondent specified rights).

As to symptoms of psychosis, the psychiatrist explained that Kara was presenting "grandiose and paranoid and somatic delusional beliefs." He testified that Kara believed she had "psychic powers" and could "read other people's minds"; she thought she was "the subject of a documentary television series" about her life, which was being "made without her consent and . . . broadcast on national television"; she believed she was pregnant, but she had tested negative on multiple pregnancy tests since being admitted to API; and she said she had been raped by an API staff member the night before the commitment hearing, although API's security camera showed that no one had entered her hospital room that night.

The psychiatrist described the events leading up to Kara's second admission. He testified that she had "wandered out of her home in clothing that was not adequate for the subfreezing temperature" and stood in front of a school for five hours "ostensibly because she was waiting for her children to come out." But he explained Kara did not have any school-aged children. He stated that she had initially left her home because she had been frightened by "hundreds of spirits" that she believed were in her backyard. Since returning to API, Kara had told him that the spirits were also in her hospital room.

The psychiatrist testified that Kara's vital signs were stable, but that she was not eating or drinking because she believed her food was "tainted and poisoned." He estimated that she was given a 2,000-calorie diet while at API, but that she was currently consuming "under 200 calories a day." He testified that Kara was also consuming "under 600 milliliters of fluid," which was "a medical concern" because she was not consuming enough food and drink "to sustain life over the long term."

The psychiatrist related Kara's allegation that she had been sexually harassed at work by a supervisor. He thought Kara's allegations of workplace harassment were plausible.

The psychiatrist identified three possible causes of Kara's delusional beliefs.[7] First, assuming the truth of her allegations that she had been sexually harassed at work, he explained that these circumstances could have been "sufficient to produce a psychotic break." Second, he testified that Kara had a "long history of depression." He explained that depression can occur in bipolar disorder and that Kara, at 38 years old, was in the age range that bipolar disorder "often declares itself in . . . women."

Third, he testified that Kara had reported a family history of lupus, an autoimmune disease. He noted that Kara had presented two physical indicators of the disease, including a distinctive "malar rash or a butterfly rash" on both cheeks and "significantly impaired kidney function" during her first admission. He testified that "lupus is a rare but known cause of bipolar and psychotic symptoms" which "might explain [Kara's] very rapid descent into . . . profound psychosis." He testified it was important for Kara to receive "a medical workup for lupus," but that she had refused to do one. He stated that Kara had also refused to sign a medical release, which prevented him from accessing her outpatient medical records or contacting her family or friends.

When asked if his treatment recommendation would be different if he had been able to confirm a diagnosis of lupus, the psychiatrist answered that he would have still recommended the same course of treatment for Kara's psychosis. He also opined that Kara would need additional testing and, possibly, treatment for lupus. He concluded that a lupus diagnosis would not have altered his decision to petition for Kara's 30-day involuntary commitment.

---

[7] The psychiatrist dismissed a fourth cause as unlikely. He testified that Kara claimed to have post-traumatic stress disorder (PTSD). He testified to his belief that PTSD was not causing Kara's delusional beliefs because "psychosis in PTSD is very rare" and because when psychosis does occur, it manifests as "an absolutely lifelike re-living of a traumatic experience . . . . [I]t does not branch out into a series of unrelated delusions."

### 2. Commitment order and appeal

At the close of evidence, the master found there was clear and convincing evidence that Kara was mentally ill.[8] The master credited the psychiatrist's testimony describing the extent of Kara's delusional beliefs. Regarding lupus, the master explained that "although there may be an organic cause [to the mental illness] . . . the symptoms, the manifestation right now demonstrates a mental illness currently with the psychotic features."

The master also found, by clear and convincing evidence, that Kara was gravely disabled.[9] The master acknowledged that "a month ago [Kara] was functioning very well and apparently has functioned very highly for a long time and clearly is bright and articulate and intelligent." But the master found that "at this point" Kara could not take care of her basic needs because she was not eating or drinking. The master also found that Kara could not provide herself with shelter because she had left her home based on a delusional belief that there were spirits in her backyard and she had then "stood outside of the school for five hours which may have [resulted] in hypothermia." The master recommended that the superior court approve proposed findings and commit Kara to API for 30 days.

Kara objected to the master's recommended findings, arguing API had failed to prove, by clear and convincing evidence, that she was mentally ill under

---

[8] *See* AS 47.30.735(c) ("At the conclusion of the hearing the court may commit the respondent to a treatment facility for not more than 30 days if it finds, by clear and convincing evidence, that the respondent is mentally ill and as a result is likely to cause harm to the respondent or others or is gravely disabled.").

[9] *See* AS 47.30.915(11) (" '[G]ravely disabled' means a condition in which a person as a result of mental illness (A) is in danger of physical harm arising from such complete neglect of basic needs for food, clothing, shelter, or personal safety as to render serious accident, illness, or death highly probable if care by another is not taken; or (B) is so incapacitated that the person is incapable of surviving safely in freedom . . . .").

AS 47.30.915(17). Although the psychiatrist had testified that lupus was one potential cause of Kara's delusions, Kara argued he had issued a "provisional diagnosis of Bipolar with psychotic features." Kara argued that "it is just as likely" that she was "suffering from a medical condition and not a mental health crisis." Kara thus contended that the psychiatrist's testimony was "equivocal" and did not constitute clear and convincing evidence of a mental illness.

API opposed Kara's objections, arguing that the psychiatrist had "testified without contradiction that bipolar often shows up for the first time in women of the respondent's age." Citing *E.P. v. Alaska Psychiatric Institute*,[10] API also argued that "to the extent [Kara] is arguing that she has lupus, and her lupus is causing her psychosis . . . the source of the mental illness does not matter." API argued that in our decision in *E.P.* we distinguished between "the *cause* of the 'mental illness' and the 'mental illness' itself."

The superior court adopted the master's recommended findings and ordered Kara's 30-day involuntary commitment to API. In a handwritten note, the superior court explained:

> (1) [E]ven if lupus is causing the psychosis, per *E.P. v. API*, . . . the evidence, by the [clear and convincing] standard, establishes that she is currently experiencing a mental illness — the source does not matter, and (2) while [Kara]'s situation is unusual, the evidence nonetheless establishes that, at present, she suffers from a mental illness[.] [N]otably, [the psychiatrist] did not have a release that would have allowed him to review [Kara]'s records [or] speak [with] her providers[.]

Kara appeals.

---

[10] 205 P.3d 1101 (Alaska 2009).

## III. STANDARD OF REVIEW

"We apply our independent judgment to the interpretation of the Alaska Constitution and the mental health commitment statutes."[11]  Independent judgment review also applies to "whether the superior court's 'findings meet the involuntary commitment . . . statutory requirements.' "[12]  When applying our independent judgment, we adopt "the rule of law that is most persuasive in light of reason, precedent, and policy."[13]

## IV. DISCUSSION

On appeal Kara contends the superior court's finding of mental illness was constitutionally infirm because API failed to "rule out" the possibility that her psychosis was caused by lupus.  Kara argues that under these circumstances she should have been referred to a hospital for treatment for lupus, and that API is therefore unable to show that her involuntary commitment was the least restrictive alternative.  Kara's arguments are not persuasive, and we affirm the court's order for her involuntary commitment.

### A. There Was Clear And Convincing Evidence That Kara Suffered From A Mental Illness.

Kara suggests that we must construe the term "mental illness" to exclude mental or emotional impairments that may result from an underlying physical medical condition, such as lupus.  Alternatively, she argues that due process requires courts to first "rule out" a physical condition as the cause of the respondent's organic, mental, or emotional impairment.  We consider each argument in turn.

---

[11]  *In re Hospitalization of Mabel B.*, 485 P.3d 1018, 1024 (Alaska 2021) (quoting *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 837 (Alaska 2014)).

[12]  *In re Hospitalization of Mark V.*, 501 P.3d 228, 234 (Alaska 2021) (quoting *In re Hospitalization of Jacob S.*, 384 P.3d 758, 764 (Alaska 2016)).

[13]  *In re Mabel B.*, 485 P.3d at 1024 (quoting *In re Hospitalization of Naomi B.*, 435 P.3d 918, 924 (Alaska 2019)).

We conclude that the statutory definition of "mental illness" does not exclude mental or emotional impairments that result from a physical condition, and that due process does not obligate courts to "rule out" physical medical conditions as the cause of a mental illness. Kara reads the statute to require courts to rule out physical medical conditions like lupus as the cause of a person's psychosis because a mental illness must be "an organic, mental . . . impairment," and "[t]he 'mental illness' definition excludes certain conditions that might otherwise appear to qualify." But illness arising from lupus is not one of the conditions listed in the statute and nothing in the legislative history suggests that the legislature intended that it should be excluded. We therefore decline to hold that the statute requires courts to rule out such conditions. Further, due process does not require us to adopt Kara's reading because the civil commitment statutes contain adequate protection against erroneous confinement based on physical medical conditions.

### 1. Statutory definition of mental illness

"When interpreting a statute 'we begin with the plain meaning of the statutory text.' "[14] We then apply "a sliding scale approach to statutory interpretation, in which '[t]he plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be.' "[15]

---

[14] *State Dep't of Pub. Safety v. Doe*, 425 P.3d 115, 119 (Alaska 2018) (quoting *Hendricks-Pearce v. State, Dep't of Corr.*, 323 P.3d 30, 35 (Alaska 2014)).

[15] *In re Hospitalization of Jacob S.*, 384 P.3d 758, 771 (Alaska 2016) (quoting *Huit v. Ashwater Burns, Inc.*, 372 P.3d 904, 912 (Alaska 2016) (alteration in original)).

### a.    Text

In an involuntary commitment proceeding, in addition to other prerequisites, the State bears the burden of proving the respondent has a mental illness.[16] AS 47.30.915(17) defines "mental illness":

> "[M]ental illness" means an organic, mental, or emotional impairment that has substantial adverse effects on an individual's ability to exercise conscious control of the individual's actions or ability to perceive reality or to reason or understand; intellectual disability, developmental disability, or both, epilepsy, drug addiction, and alcoholism do not per se constitute mental illness, although persons suffering from these conditions may also be suffering from mental illness.[17]

This definition lists five excluded conditions that "do not per se constitute mental illness":   intellectual disability, developmental disability, epilepsy, drug addiction, and alcoholism.[18]   Kara argues that this list of conditions suggests the legislature intended to exclude mental illness resulting from an underlying physical condition, and that psychosis secondary to lupus must therefore fall outside the definition of "mental illness."  We cannot agree.

Beginning with the text, lupus is not listed as an excluded condition under AS 47.30.915(17).  The semantic canon *expressio unius est exclusio alterius* suggests

---

[16]    AS 47.30.735(c).  Before a court can order involuntary commitment, the State must also prove that "as a result" of the respondent's mental illness, the person "is likely to cause harm to the respondent or others or is gravely disabled."  *Id.*  A respondent is "gravely disabled" if the person "(A) is in danger of physical harm arising from such complete neglect of basic needs for food, clothing, shelter, or personal safety as to render serious accident, illness, or death highly probable if care by another is not taken; or (B) is so incapacitated that the person is incapable of surviving safely in freedom."  AS 47.30.915(11).  Finally, the State must prove no "feasible less restrictive alternative treatment is available."   *In re Naomi B.*, 435 P.3d at 932 (citing AS 47.30.735(d)).

[17]    AS 47.30.915(17).

[18]    *Id.*

that an item omitted from a list of exclusions is presumed not to be excluded.[19] The definition of mental illness also internally refers back to "these conditions," which reinforces an inference that the list should be considered exhaustive.[20]

Kara posits that "a person with epilepsy or a typical intellectual/developmental disability generally has, by definition, an immutable condition that impairs their capacity." People with these excluded conditions, Kara argues, "will almost always be considered mentally ill" under AS 47.30 if a court can find someone mentally ill based on an impaired capacity or a lack of volition – unless the court rules out an excluded condition as the cause of those symptoms. She argues it necessarily follows that a court must rule out excluded conditions like epilepsy or intellectual/developmental disability as the cause of psychiatric symptoms to avoid committing someone because of an excluded condition.

But even assuming arguendo that courts must rule out excluded conditions as the cause of a respondent's psychiatric symptoms, the statute does not direct courts to do the same with conditions like lupus. Kara's reading would impose an extra-textual requirement on involuntary commitment proceedings. We decline to adopt such a reading. The statute does not list lupus as an excluded condition, and nothing in the plain text indicates that the legislature intended to exclude any condition other than those listed.

---

[19] *Croft v. Pan Alaska Trucking, Inc.*, 820 P.2d 1064, 1066 (Alaska 1991) ("The maxim establishes the inference that, where certain things are designated in a statute, 'all omissions should be understood as exclusions.' The maxim is one of longstanding application, and it is essentially an application of common sense and logic." (quoting *Puller v. Municipality of Anchorage*, 574 P.2d 1285, 1287 (Alaska 1978))).

[20] *See* AS 47.30.915(17).

### b. Legislative history

Kara has not identified any legislative history suggesting that the legislature intended to treat lupus as an excluded condition. If "a statute's meaning appears clear and unambiguous, . . . the party asserting a different meaning bears a correspondingly heavy burden of demonstrating contrary legislative intent."[21] The statutory definition of "mental illness" is clear and unambiguous. In contrast, the legislative history relied upon by Kara does not show any clear intent to define "mental illness" in a manner inconsistent with the plain language of the statute.

The current statutory definition of "mental illness" was adopted with the passage of Senate Bill 100 (S.B. 100) in 1981.[22] S.B. 100 also added a requirement that a physician and a mental health professional examine the respondent's "mental and physical condition . . . within 24 hours after arrival at the facility."[23] In testimony before the Senate Health, Education, and Social Services Committee, the Director of the Division of Mental Health explained it was a "positive addition" that S.B. 100 required consideration of whether a respondent's delusional behavior had a "physical basis" like "delirium coming from a fever state, pneumonia for instance," "hyperthyroidism," or "being overmedicated on multiple drugs in the case of senior

---

[21]     *Phillips v. Bremner-Phillips*, 477 P.3d 626, 632 (Alaska 2020) (quoting *State v. Fyfe*, 370 P.3d 1092, 1095 (Alaska 2016)); *see also In re Protective Proc. of Nora D.*, 485 P.3d 1058, 1064 (Alaska 2021) (explaining that we use "a sliding scale approach: '[T]he plainer the language of the statute, the more convincing contrary legislative history must be.' " (quoting *Marathon Oil Co. v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1082 (Alaska 2011))).

[22]     Ch. 84, § 1, SLA 1981 (codified at AS 47.30.915(17)).

[23]     Ch. 84, § 1, SLA 1981 (codified at AS 47.30.710(a)).

citizens."[24] He noted that instead of "demon possession being the number one cause of mental illness, . . . many of them are caused by physical conditions."[25]

A former Director of the Division of Mental Health also testified before the Senate Judiciary Committee. He explained that the examination requirement was important to prevent "a loophole where a person with a physical illness could just go without the attention of a physician too long and that could result in a tragic death."[26] He identified one case where a patient with a blood infection was "dead within a matter of hours,"[27] and expressed concern that "physically ill people will be transported hundreds of miles needlessly. These persons will be at risk of dying themselves and of exposing other people to serious illnesses."[28] He later submitted a letter to the committee identifying lupus as one such physical condition sometimes causing psychotic symptoms.[29]

This legislative history shows that the requirement for a physician to conduct a physical examination during commitment was a precaution intended to identify serious medical conditions that, if left untreated, could result in death, medical complications, or contagion. Contrary to Kara's argument, the legislative history does not show that the definition of "mental illness" was intended to exclude psychiatric impairments resulting from physical medical conditions.

---

[24] Testimony of Verner Stillner, Director, Division of Mental Health at 40:50-51:23, Hearing on S.B. 100 Before the S. Health, Educ. & Soc. Servs. Comm., 12th Leg., 1st Sess. (Feb. 25, 1981).

[25] *Id.*

[26] Testimony of Jerry Schrader, Former Director, Division of Mental Health at 29:28-29:45, Hearing on S.B. 100 Before the S. Jud. Comm., 12th Leg., 1st Sess. (Apr. 22, 1981).

[27] *Id.* at 31:00-31:21.

[28] Letter from Jerry Schrader to Sen. William Ray, 1 (Apr. 28, 1981).

[29] *Id.* at 3.

Kara has not met her heavy burden to demonstrate contrary legislative intent. We thus conclude that lupus is not excluded from the definition of "mental illness" in AS 47.30.915(17).

### 2. Due process

Using *Wetherhorn v. Alaska Psychiatric Institute*[30] as a benchmark, Kara challenges the statutory definition of "mental illness" provided in AS 47.30.915(17) as an impingement on her constitutional rights. We have recognized that "involuntary commitment for a mental illness is a 'massive curtailment of liberty' that demands due process of law."[31] We evaluate what process is due in light of the fundamental rights secured under both the United States Constitution[32] and the Alaska Constitution's "more protective" guarantees of individual liberty[33] and privacy.[34]

---

[30] 156 P.3d 371 (Alaska 2007), *abrogated on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918, 929 (Alaska 2019).

[31] *In re Naomi B.*, 435 P.3d at 931 (quoting *Wetherhorn*, 156 P.3d at 375-76); *see also id.* (explaining "that constitutional rights 'extend "equally to mentally ill persons" so that the mentally ill are not treated "as persons of lesser status or dignity because of their illness" ' " (quoting *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 248 (Alaska 2006))).

[32] U.S. Const. amend. XIV, § 1.

[33] *See* Alaska Const. art. I, § 7 ("No person shall be deprived of life, liberty, or property, without due process of law."); Alaska Const. art. I, § 1 ("This constitution is dedicated to the principles that all persons have a natural right to life, liberty, the pursuit of happiness, and the enjoyment of the rewards of their own industry."); *Myers*, 138 P.3d at 245 (noting "Alaska's constitutional guarantee of individual liberty" is "more protective" than its federal counterpart).

[34] *See* Alaska Const. art. I, § 22 ("The right of the people to privacy is recognized and shall not be infringed."); *see also Myers*, 138 P.3d at 245 (explaining that Alaska's guarantee of privacy is broader than U.S. Constitution's because Alaska Constitution "expressly provid[es] for a right to privacy" (quoting *Anchorage Police Dep't Emps. Ass'n v. Mun. of Anchorage*, 24 P.3d 547, 550 (Alaska 2001))).

Unlike the respondent in *Wetherhorn*, Kara has not shown that a narrowing construction or extra-statutory requirement is necessary to protect against a "massive curtailment of liberty" without due process.[35]  The definition of "mental illness" under AS 47.30.915(17) does not create an unacceptable risk that a person will be confined for impermissible reasons.  The civil commitment statutes guard against erroneous confinement because they focus the commitment inquiry on whether the respondent's dangerousness or grave disability is caused by an "organic, mental, or emotional impairment" with "substantial adverse effects" on volition.[36]  The statutory requirement that a physical evaluation be conducted contemporaneously with a mental health evaluation guards against the risk that the respondent will languish without appropriate treatment for physical conditions or disease.[37]

### 3.    Kara's commitment hearing

At the commitment hearing the psychiatrist testified that Kara's psychotic symptoms were consistent with bipolar I disorder and that "lupus is a rare but known cause of bipolar and psychotic symptoms."  He also testified that his treatment recommendation would have remained the same even if he had been able to confirm that Kara actually had lupus.  We conclude that the psychiatrist's uncontradicted testimony regarding Kara's psychotic condition supports the superior court's finding of mental illness by clear and convincing evidence.  This conclusion fits comfortably within the bounds of our prior decisions.[38]

---

[35]    *Wetherhorn*, 156 P.3d at 375 *abrogated on other grounds by In re Naomi B.*, 435 P.3d at 929 (quoting *Humphrey v. Cady*, 405 U.S. 504, 509 (1972)).

[36]    *See* AS 47.30.915(17) (defining "mental illness");  AS 47.30.735(c) (stating criteria for 30-day commitment).

[37]    *See* AS 47.30.710(a).

[38]    *See, e.g.*, *In re Hospitalization of Naomi B.*, 435 P.3d 918, 921 (Alaska 2019) (describing respondent's reports of "being repeatedly raped, hit, and assaulted"

The superior court did not err in concluding there was clear and convincing evidence that Kara suffered from a mental illness within the meaning of AS 47.30.915(17).

**B.    The Superior Court's Application Of Our Reasoning In *E.P.* Was Not Erroneous.**

Kara also challenges the superior court's reliance on *E.P.*[39]   The court found that because the evidence showed Kara was "currently experiencing a mental illness," the "source does not matter."  Kara argues that the court's interpretation of *E.P.* is problematic, "namely, that any organic impairment — essentially any illness — that manifests in psychiatric symptoms constitutes a 'mental illness,' regardless of the cause."[40]   To avoid the commitment of an individual who has an underlying medical cause for her psychiatric symptoms, Kara argues that we should limit *E.P.*'s holding to circumstances involving drugs and alcohol.

In *E.P.* we described the petitioner's organic brain damage, which resulted in "greatly impaired ability to exercise judgment, loss of perception of reality, and

---

while at API were "delusions caused by mental illness" from "schizoaffective disorder, bipolar subtype"); *id.* at 922 (describing respondent's schizophrenia diagnosis as mental illness substantiated by paranoid and delusions thoughts, including that "members of a drug cartel had attempted to poison her"); *In re Hospitalization of Tracy C.*, 249 P.3d 1085, 1087 (Alaska, 2011) (describing bipolar I disorder diagnosis and physician's testimony describing respondent's agitation, rambling speech, inappropriate laughing, and paranoid delusions about her family and employer as mental illness).

[39]    205 P.3d 1101 (Alaska 2009).

[40]    Kara also claims that E.P. did not raise the issue of whether he had a mental illness, so the court's decision was not "necessary to the resolution of the issues before it."  But API quotes a portion of E.P.'s briefing, which argued that "E.P.'s addiction to alcohol and gasoline . . . do not meet the statutory definition of mental illness."  Opening Brief of Appellant, *E.P. v. Alaska Psychiatric Inst.*, S-12853, S-12934, S-13004, 2008 WL 11519508, at *3, *19-22 (Apr. 9, 2008).  Given the arguments made in *E.P.*, we see no reason why the superior court could not conclude that *E.P.* provided persuasive authority.

impaired ability to communicate," as a condition both "apart from, and more than, his drug addiction."[41]  We explained that E.P.'s continuing desire to huff gas arose "not only from addiction, but also from his cognitive inability to understand his situation."[42]  And we affirmed the commitment because E.P.'s intent to continue huffing gas if released was "something *more than* an addiction."[43]

A careful reading of *E.P.* shows we did not hold that evidence of a mental illness must be both "apart from, *and* more than" an excluded condition to establish the respondent has a mental illness that justifies civil commitment.  Although our imprecision in *E.P.* may have suggested otherwise, we now disavow any such implication.[44]  Under the statutory definition of "mental illness," excluded conditions "do not per se constitute mental illness."[45]  In this context, the plain meaning of "per se" is that "the excluded conditions do not *by themselves, standing alone*, constitute mental illness."[46]  The petitioner must therefore present evidence that the respondent suffers from "an organic, mental, or emotional impairment"[47] that is either apart from *or* more than an excluded condition.[48]  A requirement that a mental illness be both "apart

---

[41]  205 P.3d at 1109.

[42]  *Id*.

[43]  *Id*. at 1110.

[44]  We also disavow the statement in our unpublished decision in *In re Hospitalization of Duane M.* that a mental illness that justifies involuntary commitment must be "apart from, *and* more than," a respondent's excluded condition.  *See* No. S-16885, 2020 WL 1165853, at *5 (Alaska Mar. 11, 2020) (emphasis added).

[45]  AS 47.30.915(17).

[46]  *In re Necessity for the Hospitalization of Dominic N.*, 548 P.3d 630, 635 (Alaska 2024) (emphasis in original) (citing *Per se*, BLACK'S LAW DICTIONARY (11th ed. 2019)).

[47]  AS 47.30.915(17).

[48]  *See In re Dominic N.*, 548 P.3d at 635 (explaining "we did not require that addiction or intellectual disability be entirely separate from mental illness in *E.P.*").

from, *and* more than" an excluded condition would go beyond the plain meaning of the statutory text.

Kara's arguments are inconsistent with our reasoning in *E.P.* Specifically, a mental or emotional impairment that is apart from or more than an excluded condition can qualify as a mental illness even if that mental impairment was originally caused by an excluded condition. Contrary to Kara's assertion, the superior court's application of *E.P.* did not read excluded conditions entirely out of the definition because lupus is not an excluded condition, and we decline to treat it as one. And whether or not Kara had lupus, her delusional thoughts and behavior were consistent with a mental or emotional impairment that had diminished her ability to perceive reality.[49] Kara does not provide a persuasive reason to limit *E.P.*'s holding to circumstances involving drugs or alcohol.

The superior court's dismissal of the relevance of lupus as the potential cause of Kara's delusional beliefs was premised on clear and convincing evidence that Kara was experiencing a mental illness. We see no error with the court's reasoning or application of our holding in *E.P.*

C. **It Was Not Error To Find That API Was The Least Restrictive Alternative.**

Kara maintains that because API failed to "rule out" the possibility that her psychosis was caused by lupus, API is unable to show that her involuntary hospitalization was the least restrictive alternative treatment. In other words, Kara argues she should have been taken to a medical hospital to be evaluated for lupus instead of being committed involuntarily for mental health treatment at API.

---

[49]     See AS 47.30.915(17) (" '[M]ental illness' means an organic, mental, or emotional impairment that has substantial adverse effects on an individual's ability to exercise conscious control of the individual's actions or ability to perceive reality or to reason or understand.").

In an involuntary commitment proceeding, the State bears the burden of proving there are no less restrictive alternatives to institutional treatment.[50] The absence of a less restrictive alternative must be substantiated by clear and convincing evidence.[51]

At oral argument Kara acknowledged that her arguments regarding the least restrictive alternative inquiry were encompassed by her proposed construction of the definition of "mental illness." We have rejected Kara's proposed construction and arguments that API was required to "rule out" the possibility that her psychosis was caused by lupus. Thus, we also reject Kara's argument that the court erred regarding the least restrictive alternative inquiry.

The record supports the conclusion that involuntary commitment was the least restrictive alternative in this case. The psychiatrist stated he would recommend commitment to treat Kara's psychosis based on her psychotic symptoms even if he could confirm Kara had lupus. Although the psychiatrist testified that Kara had some "physical signs" of lupus, no testimony indicated that these symptoms were significant enough to warrant her being taken to a medical hospital for treatment. Kara had "significantly impaired kidney function" during her first admission, but she did not have such an impairment during her second admission. The psychiatrist testified that Kara's kidneys might become a medical concern, but that was only because she was not consuming enough fluids, which was an issue caused by her psychotic beliefs that someone was poisoning her food and drink. Thus, to the extent the psychiatrist was worried that Kara might suffer from any medical issues, that concern was premised on

---

[50] AS 47.30.735(d); *In re Hospitalization of Sergio F.*, 529 P.3d 74, 78-79 (Alaska 2023) (citing *In re Naomi B.*, 435 P.3d at 934).

[51] *In re Sergio F.*, 529 P.3d at 78-79 ("A less restrictive alternative must be feasible, available, and provide 'adequate treatment' for a respondent." (quoting *In re Hospitalization of Danielle B.*, 453 P.3d 200, 204 (Alaska 2019))).

complications caused primarily by her mental illness, which the psychiatrist described as a "rapid descent into . . . profound psychosis."

Based on the psychiatrist's testimony we cannot say the superior court erred by concluding there was clear and convincing evidence that treatment for Kara's mental illness at API was the least restrictive available alternative.

## V.    CONCLUSION

We AFFIRM the 30-day commitment order.